MITCHELL M. ROSNER, Plaintiff-Appellee, v. FIELD ENTERPRISES, INC., *et al.*, Defendants-Appellants.

First District (1st Division) No. 1—87—1137

Opinion filed June 18, 1990.—Supplemental opinion filed on denial of rehearing December 24, 1990.

774

Isham, Lincoln & Beale, of Chicago (A. Daniel Feldman, Daniel S. Hefter, and Margaret S. Determan, of counsel), for appellants.

Foss, Schuman, Drake & Barnard, of Chicago (George C. Pontikes, of counsel), for appellee.

JUSTICE MANNING delivered the opinion of the court:

The present matter comes before this court as a permissive interlocutory appeal filed by defendants, Field Enterprises, Inc., former publisher of the Chicago Sun-Times, and several of its employees: Pamela Zekman, Larry Cose, Gilbert Jimenez,[1] Gene Mustain, Pat Smith, Norma Sosa, John H. White and Chris Bockelmann (defendants), pursuant to Supreme Court Rule 308 (107 Ill. 2d R. 308). The appeal primarily concerns the issue of whether or not the actual malice standard applies to the underlying libel action. In the libel suit, plaintiff, Mitchell M. Rosner, a podiatrist, seeks damages against defendants, maintaining that he has been defamed in his profession as a result of a series of newspaper articles and photographs which were published by defendants in February 1980. The relevant facts are as follows.

Commencing in 1979, the defendants, Chicago Sun-Times, along with WLS-TV,[2] conducted an eight-month investigation on automobile accident insurance fraud. Reporters and investigators from the two news organizations, with the cooperation of the Chicago police department and Allstate Insurance Company, posed as noninjured or only slightly injured accident victims and sought the treatment and services of various "accident chasers," doctors, lawyers, clinics, chiropractors and hospitals.

On October 25, 1979, as part of the investigation, defendants Pat Smith and Larry Cose, posing as victims of an automobile accident, went to the law offices of Harold Pope. Mr. Pope referred them to Dr. B. E. Graham, who was located at 71st and Crandon—The Holy Name Medical Center.

Later that day, Cose and Smith visited the Holy Name Medical

---

[1]Gilbert Jimenez has been dismissed as a party to this appeal.

[2]American Broadcasting Company, the owner and operator of WLS-TV, was also a defendant in this action but was granted summary judgment prior to this appeal. Thus, the Field defendants are the only defendants remaining in this case.

Center. The receptionist gave them some medical forms to complete and then led the reporters to the clinic's waiting area. Next, they went one at a time into Dr. Rosner's office, who reviewed the forms, tested their reflexes and inquired if they had any foot problems. Rosner then told the reporters that another doctor would see them shortly. The reporters were thereafter called individually into a separate examination room by Dr. Betty Graham, where she examined and sent them to the office of Dr. Patrick Maloney. Allegedly, Dr. Maloney examined the reporters, instructed them to take time off from work and prescribed heat treatments for them.

On December 3, 1979, Gilbert Jimenez accompanied Willie Chriesman and Gene Mustain, who was using the pseudonym "John White," to the law offices of Basil Elias to see John Rusniak. Mr. Rusniak interviewed the reporters and then purportedly telephoned Dr. Graham and told her that Chriesman, Mustain and two other persons had been involved in a car accident.

Later that afternoon, Chriesman went to the Holy Name Medical Center. First, he completed a medical form. After a brief wait, Dr. Rosner called him into an examination room, reviewed his chart and tested his reflexes. Then, Dr. Graham examined Chriesman and advised him to come in every day for treatments. Dr. Maloney then called Chriesman into his office and told him to come in every day for treatments.

The next day, December 4, 1979, Mustain and Pat Smith, who had altered her appearance and used the pseudonym "Ann Connor," visited Holy Name Medical Center. After a few minutes, Dr. Rosner called Mustain into his examination room. Rosner asked Mustain about the accident and his injuries, tested his reflexes and told him that Dr. Graham would see him next.

Then, Dr. Rosner called Smith into his examination room. He inquired if she had hurt her feet or legs and tested her reflexes. Allegedly, "Dr. Rosner felt Pat Smith's foot through her boot during this 'examination.'" He then told Smith that she would see Dr. Graham next. Dr. Graham and Dr. Maloney conducted the examinations on Smith and prescribed treatments.

Following the investigation, the defendants published a series of their findings on automobile accident insurance fraud in the newspaper between February 10, 1980, and February 27, 1980. The entire series of text and photographs, along with additional material, was then published by the Chicago Sun-Times as a special reprint booklet on March 11, 1980.

The newspaper articles and photograph upon which the complaint

was based appeared in the *Chicago Sun-Times* newspapers on February 15 and 19, 1980. The February 15, 1980, article described the result of "an eight-month investigation of automobile insurance fraud, part of a series known as 'The Accident Swindlers.' " Although there was no specific mention of plaintiff in this article, next to the article was published a photograph in which a portion of the plaintiff's name and specialty were prominently displayed on a building in the background. The photograph itself pictures two men standing next to the building and the caption thereunder reads:

"SHOP TALK? Jack Curtin (right) talks with Lloyd Washington outside Holy Name Medical Center, 7101 S. Crandon. Curtin runs a lawyer's accident office on the South Side and this series has already reported how he coaches accident 'victims' to exaggerate injuries in order to inflate insurance settlements. Washington is a known ambulance chaser."

The February 19, 1980, article, *inter alia*, made the following references to plaintiff:

(1) "Things weren't any more professional at Holy Name Medical Center, 71st and Crandon, where a podiatrist 'examined' one reporter's feet by feeling through her boots."

(2) "All were either examined or asked about foot problems by a podiatrist, Dr. Mitchell M. Rossner [sic]. He sent each along to chiropractor Betty E. Graham, a 30-year-old Haitian who performs the actual examinations."

(3) "The Rossner [sic]-Graham-Maloney triple threat went into action again when Chriesman, Smith and Mustain returned to Holy Name more than a month later."

(4) "When Sun-Times and WLS reporters visited Holy Name several weeks later, Maloney refused to see them. Graham, Dekens, and Rossner [sic] were said to be unavailable."

Plaintiff filed an original and first amended complaint. After motions to strike and dismiss were sustained, plaintiff filed his second amended complaint, which is currently pending before the court below. In response thereto, defendants filed an answer, affirmative defenses, and thereafter, a motion for judgment on the pleadings. Both parties filed memoranda in support of and in response to the motion for judgment on the pleadings.

After the briefings, Judge O'Brien in a December 1982 opinion, denied the motion for judgment on the pleadings as to all publications, excepting the February 15, 1980, publication, as of the date of its original publication.

In August 1986, after the close of discovery, defendants moved for

summary judgment. In support of their motion, they filed a memorandum of law, affidavits of six reporters and portions of deposition transcripts. Defendants argued that this case is governed by the actual malice standard and that the record disclosed that plaintiff could not, as a matter of law, prove actual malice. In January 1987, plaintiff filed his memorandum of law in response to the summary judgment motion. However, no affidavits or other materials were filed in support of the response. In February 1987, the circuit court denied defendants' motion for summary judgment, finding that the actual malice standard did not apply to this case and that there was a genuine issue of material fact as to whether or not defendants had reasonable grounds to believe that the publications as to plaintiff were true. On April 9, 1987, the circuit court denied defendants' motion for reconsideration of the order denying summary judgment but granted their alternative motion for a finding pursuant to Rule 308. The proceedings in the circuit court were stayed pending resolution of this matter on appeal.

▪■ To take an appeal under Rule 308, which governs permissible interlocutory appeals, it is necessary for the trial court to make a written finding that its order involves a question of law as to which there is substantial ground for a difference of opinion and that an immediate appeal would materially advance the ultimate termination of litigation. (See 107 Ill. 2d R. 308(a); *Moore v. Mankowitz* (1984), 127 Ill. App. 3d 1050, 469 N.E.2d 1133.) The circuit court having made the requisite finding, this court accepted the interlocutory appeal to review the questions certified to us.

The two questions of law certified by the circuit court pursuant to Rule 308 for our review are:

(1) "Whether *Farnsworth v. Tribune Co.* (1969), 43 Ill. 2d 286, 253 N.E.2d 408 and *Chapski v. The Copley Press* (1982), 92 Ill. 2d 344, 422 N.E.2d 195, require the application of the 'actual malice' standard to this libel suit on the ground that it concerns a newspaper story about Dr. Rosner's professional practice[,]" and

(2) "If the actual malice standard does not apply, whether there is a genuine issue of material fact presented as to whether the defendants had reasonable grounds for their belief in the truth of their publication where the defendants have filed uncontradicted affidavits and deposition transcripts in support of their motion for summary judgment, and the plaintiff has rested on the contrary allegations of his second amended complaint[.]"

For the following reasons, we affirm the trial court's order denying the defendants' motion for summary judgment. The stay of proceeding heretofore entered is lifted, and the cause is remanded to the trial court for further proceedings.

■ We note from the outset that our analysis and decision in this matter, to a great extent, begin with the United States Supreme Court's decision in *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997, and concern the inquiry of "what degree of fault a private person bringing a defamation action against a media defendant must prove in order to recover actual damages[3] under [Illinois] State constitutional and [common] law, given the fact that the Supreme Court left to the States the choice of which standard of fault was to be imposed in defamation actions by private persons seeking actual damages from media defendants." (Annot., *State Constitutional Protection of Allegedly Defamatory Statements Regarding Private Individual*, 33 A.L.R. 4th 212, 215-16 (1984); see also *Gertz*, 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997.) As outlined in the annotation, this question has arisen on several occasions in the various jurisdictions; and while the standards of fault which have evolved fall into two or three classes, the rationales relied upon by the various courts for using such standards have been diverse.

Thus, in order to address properly the questions of law certified to this court on appeal, it is necessary that we first preface our analysis with a brief historical discussion on the law of defamation. We will review our Federal court decisions and then comment on the law of defamation in other State jurisdictions in general and, in particular, the law of defamation in Illinois. Next, we will analyze the Supreme Court decision in *Gertz* (418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997) and the Illinois Supreme Court decisions in *Farnsworth v. Tribune Co.* (1969), 43 Ill. 2d 286, and *Chapski v. Copley Press* (1982), 92 Ill. 2d 344. We will review these cases in conjunction with the other cases relied upon by the parties and the circuit court in rendering its decision denying summary judgment on behalf of defendants. In so doing, we expect to shed some light upon the confused state of the law of defamation in Illinois as it relates to the applicable standard of fault required in libel actions brought by private individuals wherein the subject matter involves an issue of public concern. Moreover, we

---

[3]In *Gertz* (418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997), our Court has determined that the States could impose whatever standard they chose, excepting strict liability, to allow a plaintiff to recover actual damages. However, a showing of actual malice is required in such cases to recover punitive damages.

hope to clarify and reconcile the recent divergent holdings of this court in defamation cases as they relate to the interrelated issues of public person versus private person, the application of the actual malice standard versus a negligence standard, the applicability and relevance of conditional privileges, especially that of "fair comment" after *Gertz*, and the application of the innocent construction rule.

Finally, we must review the appropriateness and efficacy of the summary judgment order entered by the circuit court. Regardless of which standard of fault and proof governs this case, *i.e.*, negligence or actual malice, we still must determine whether or not there exists a genuine issue of material fact to support the circuit court's denial of the motion. We then will be able to conclude whether the circuit court's decision was proper under the circumstances.

## I. HISTORICAL BACKGROUND

### A. FEDERAL CASES

Initially, the United States Supreme Court took the view that statements which were considered libelous under State law were not protected under the first amendment to the United States Constitution. (See *Chaplinsky v. New Hampshire* (1942), 315 U.S. 568, 86 L. Ed. 2d 1031, 62 S. Ct. 766. See also *Beauharnais v. Illinois* (1952), 343 U.S. 250, 96 L. Ed. 919, 72 S. Ct. 725.) The libel laws of the States traditionally had consisted of common-law principles. In most States, an alleged defamatory statement was actionable, subject only to the defenses of truth or privilege, and thus, it was understood that the common law provided strict liability to defamatory falsehoods. See generally *Beauharnais*, 343 U.S. 250, 96 L. Ed. 919, 72 S. Ct. 725.

■ However, in the landmark decision of *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, the Court for the first time, in departing from the common law, determined that State defamation actions were governed and limited by the freedom of the press guarantees of the first amendment. Plaintiff there, a police commissioner for Montgomery, Alabama, had alleged that the New York Times libeled him in relation to his official conduct. He was awarded a $500,000 judgment. The Supreme Court reversed the award and held that pursuant to the first and fourteenth amendment, "[t]he Constitutional guarantees require *** a Federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it

was false or not." (*New York Times*, 376 U.S. at 279, 11 L. Ed. 2d at 706, 84 S. Ct. at 726.) Hence, the Supreme Court limited the reach of State defamation laws to bring them in line with the goal of the free speech provision of the first amendment because the Court feared that the common-law standard of strict liability would have a chilling effect on protected speech. The Court created what is now known as a constitutional standard of liability for libel actions brought by public officials. Accordingly, a public official, in order to recover damages in a defamation action, is required to prove constitutional malice, *i.e.*, that the defendant either knew his statement was false, or recklessly disregarded whether the statement was false or not.

In *Curtis Publishing Co. v. Butts* and *Associated Press v. Walker* (1967), 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975, the Federal rule of proof of actual malice was extended to include libel actions brought by persons who were "public figures." The Court there expressed the view that the purpose behind the first amendment's guarantees of free speech and free press was to protect robust discussion of "all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." (*Butts*, 388 U.S. at 147, 18 L. Ed. 2d at 1106, 87 S. Ct. at 1987.) The Court there determined that a public figure is one who "may have attained that status by position alone *** [or] by his purposeful activity amounting to a thrusting of his personality into the 'vortex' of an important public controversy." (*Butts*, 388 U.S. at 155, 18 L. Ed. 2d at 1111, 87 S. Ct. at 1991.) The Court found that a college football coach and a retired army general were public figures based upon the rationale that any person who had voluntarily embroiled him or herself in the public debate of an issue of public interest was to be considered a public figure.

■ However, since *Butts* and *Walker*, the Supreme Court has narrowed the definition of "public figure" to two classes. Those classes include: (1) persons who achieve such a degree of general fame and notoriety in the community that they are considered public figures for all purposes and in all contexts; and (2) persons who either have voluntarily injected themselves into a public controversy in order to influence the resolution of the issues involved, or have been drawn into such a controversy, thus becoming public figures for a limited range of issues. *Gertz*, 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997.

Four years after the *Butts* case, in *Rosenbloom v. Metromedia, Inc.* (1971), 403 U.S. 29, 29 L. Ed. 2d 296, 91 S. Ct. 1811, a plurality of the United States Supreme Court expressed the view that the ac-

tual malice standard should be extended to "all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous." (*Rosenbloom*, 403 U.S. at 44, 29 L. Ed. 2d at 312, 91 S. Ct. at 1820.) The Court rationalized that the actual malice standard should apply to all suits if the allegedly libelous statement related to a plaintiff's involvement in a matter of public or general interest.

However, a few years later, the *Rosenbloom* view was criticized and, in essence, overturned by a majority of the Supreme Court in *Gertz* (418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997), wherein the Court found that the "general or public interest" test adopted by *Rosenbloom* need not be applied to defamation actions brought by private individuals. The principal issue there was whether a newspaper or broadcaster that publishes defamatory falsehoods about an individual who is neither a public official nor public figure may claim a constitutional privilege against liability for the injury inflicted by the statements.

In *Gertz*, plaintiff, a well-known lawyer locally, represented the family of a youth who had been killed by a policeman. Defendant published a magazine article charging that plaintiff was a communist and that he helped to frame the officer. The United States District Court for the Northern District of Illinois found that privilege protected discussion of any public issue without regard to the status of the person defamed. That conclusion anticipated the reasoning of a plurality of the Supreme Court in *Rosenbloom*. The Court of Appeals for the Seventh Circuit agreed with the district court that the respondent could assert this constitutional privilege because the article concerned a matter of public interest, again relying on *Rosenbloom*. However, the United States Supreme Court reversed the decision.

The *Gertz* Court begins with an explanation of the dichotomy faced by courts in its statement that "[t]his Court has struggled for nearly a decade to define the proper accommodation between the law of defamation and the freedoms of speech and press protected by the First Amendment." (*Gertz*, 418 U.S. at 325, 41 L. Ed. 2d at 797, 94 S. Ct. at 3000.) The Court recognized the competing interests of the freedom of the press and the consideration not to become involved in media self-censorship on the one hand, and the States' interest of protecting private persons in their good names and reputations on the other hand.

However, in the final analysis *Gertz* not only rejected the *Rosenbloom* rationale but also developed new standards of liability and rules of damages for libel actions brought by private persons against

media defendants. By establishing two levels of constitutional protection, *Gertz* provided for some reduction of safeguards. The Court expressly affirmed the *New York Times'* actual malice rule as it applied to public officials and public figures but held that the "state interest in compensating injury to the reputation of private individuals requires that a different rule should obtain with respect to them." (*Gertz*, 418 U.S. at 343, 41 L. Ed. 2d at 807, 94 S. Ct. at 3009.) The Court further commented that the States should retain substantial latitude in their efforts to enforce a legal remedy for defamation which injured the reputation of a private person (*Gertz*, 418 U.S. at 345, 41 L. Ed. 2d at 808, 94 S. Ct. at 345-46), and concluded that "the extension of the *New York Times* test proposed by the *Rosenbloom* plurality would abridge this legitimate State interest to a degree that we find unacceptable." (*Gertz*, 418 U.S. at 346, 41 L. Ed. 2d at 809, 94 S. Ct. at 3010.) Accordingly, the Court stated:

> "We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual. This approach provides a more equitable boundary between the competing concerns involved here. It recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation. At least this conclusion obtains where, as here, the substance of the defamatory statement 'makes substantial danger to reputation apparent.' " *Gertz*, 418 U.S. at 347-48, 41 L. Ed. 2d at 809-10, 94 S. Ct. at 3010, quoting *Butts*, 388 U.S. at 155, 18 L. Ed. 2d at 1111, 87 S. Ct. at 1991.

■ Hence, *Gertz* holds that with respect to private persons, the strict rule of *New York Times* does not apply, and the States are free to define the standard of liability, provided it involves some degree of fault. (*Newell v. Field Enterprises, Inc.* (1980), 91 Ill. App. 3d 735, 752, 415 N.E.2d 434 (an analysis of this court's interpretation of *Gertz*).) However, the private individual who does not prove actual malice is limited to compensation for actual injury. *Gertz*, 418 U.S. at 350, 41 L. Ed. 2d at 811, 94 S. Ct. at 3012.

Consequently, the *Gertz* "decision stands today as the Court's most complete treatment of libel actions brought by private individuals against media defendants. Its significance cannot be overstated." (*Newell*, 91 Ill. App. 3d at 753.) In addition, as will be more fully discussed below, the conclusion that defendants ask us to reach in the

present case is precisely the conclusion of *Rosenbloom*, which was rejected by *Gertz*. We believe that *Gertz* stands for the proposition that the public interest privilege advocated by defendants here is required by neither the constitution nor State common-law principles of defamation law.

In the recent decision of *Philadelphia Newspapers, Inc. v. Hepps* (1986), 475 U.S. 767, 89 L. Ed. 2d 783, 106 S. Ct. 1558, the Supreme Court expanded upon the *Gertz* analysis and found that where a newspaper publishes speech involving public concern about a private person, the plaintiff cannot recover damages without also showing that the statements at issue are false. (*Hepps*, 475 U.S. at 778, 89 L. Ed. 2d at 793, 106 S. Ct. at 1564.) The Court further held that "the common law's rule on falsity—that the defendant must bear the burden of proving truth—must similarly fall here to a constitutional requirement that the plaintiff bear the burden of showing falsity." (*Hepps*, 475 U.S. at 776, 89 L. Ed. 2d at 792, 94 S. Ct. at 1563.) However, since 1975, our United States Supreme Court has not overruled or rejected those principles enunciated in *Gertz* which concern rules of liability and damages in defamation actions brought by private individuals.

■ As a result of these Supreme Court decisions, the common-law principles of our States have been reshaped in two specific areas in order to conform to the goals of the first amendment. The first area involves whether the plaintiff is a public official or public figure or a private person. The second area is whether the alleged defamatory statement is of public concern or interest. In the first situation, the constitution supplants the standard of the common law and requires that the plaintiff prove actual malice. However, *when the speech is of public concern or importance and the plaintiff is a private person*, as in *Gertz, the constitution still supplants the principle of the common law*; but, the constitutional requirements are less forbidding than when the plaintiff is a public figure and the speech is of public concern. *Hepps*, 475 U.S. at 775, 89 L. Ed. 2d at 792, 106 S. Ct. at 1563.

Accordingly, it is against this backdrop of Federal decisions that the common-law rules of defamation have substantially changed in the past quarter of a century. As noted previously, *Gertz* left it up to the States to impose their own standard of liability. Consequently, we are well aware of the fact that we are governed by the law of Illinois. However, in the interest of shedding some light upon the diversity of opinions in Illinois, and especially those of our own court, we will briefly review the law of the various jurisdictions.

### B. OTHER JURISDICTIONS

In our review of the law of the several jurisdictions, we will limit our consideration to the course of the decisions and law since *Gertz*. Accordingly, our research has revealed the following. Immediately after *Gertz* was decided, two States extended the "actual malice" standard to cover private plaintiffs involved in matters of public concern. See *Walker v. Colorado Springs Sun, Inc.* (Colo. 1975), 188 Colo. 86, 538 P.2d 450; *AAFCO Heating & Air Conditioning Co. v. Northwest Publications, Inc.* (1974), 162 Ind. App. 671, 321 N.E.2d 580.

At least one jurisdiction, New York, adopted a "grossly irresponsible conduct" standard of liability. (See *Chapadeau v. Utica Observer-Dispatch, Inc.* (1975), 38 N.Y.2d 196, 341 N.E.2d 569, 379 N.Y.S.2d 61.) The court in *Chapadeau* held that a private person suing a media defendant for statements arguably within the sphere of legitimate public interest could recover only if he established, by a preponderance of the evidence, that the media defendant acted in a "grossly irresponsible" manner. The court reasoned that under *Rosenbloom*, it had previously extended the constitutional privilege, which required that a plaintiff who was involved in a matter of public interest had to prove actual malice, in order to recover from a publisher of a libelous statement concerning him. However, the court further noted that inasmuch as *Gertz* had decided that a less demanding standard than actual malice was permissible, the New York court would now adopt the "gross irresponsibility" standard.

During the 1970's, the majority of the State courts to rule on the issue, however, in light of *Gertz*, chose some type of middle ground and adopted negligence as the standard of fault or liability in a defamation action brought by a private person.[4]

For example, in *Foster v. Laredo Newspapers, Inc.* (Tex. 1976), 541 S.W.2d 809, the supreme court of Texas was afforded the oppor-

---

[4]*Peagler v. Phoenix Newspapers, Inc.* (1977), 114 Ariz. 309, 560 P.2d 1216; *Dodrill v. Arkansas Democrat Co.* (1979), 265 Ark. 628, 590 S.W.2d 840; *Corbett v. Register Publishing Co.* (1975), 33 Conn. Sup. 4, 356 A.2d 472; *Cahill v. Hawaiian Paradise Park Corp.* (1975), 56 Haw. 522, 543 P.2d 1356; *Troman v. Wood* (1975), 62 Ill. 2d 184, 340 N.E.2d 292; *Gobin v. Globe Publishing Co.* (1975), 216 Kan. 223, 531 P.2d 76; *Wilson v. Capital City Press* (La. Ct. App. 1975), 315 So. 2d 393; *Jacron Sales Co. v. Sindorf* (1976), 276 Md. 580, 350 A.2d 688; *Stone v. Essex County Newspapers, Inc.* (1975), 367 Mass. 849, 330 N.E.2d 161; *Madison v. Yunker* (1978), 180 Mont. 54, 589 P.2d 126; *Thomas H. Maloney & Sons, Inc. v. E.W. Scripps Co.* (1974), 43 Ohio App. 2d 105, 334 N.E.2d 494; *Martin v. Griffin Television, Inc.* (Okla. 1976), 549 P.2d 85; *Foster v. Laredo Newspapers, Inc.* (Tex. 1976), 541 S.W.2d 809; *Taskett v. King Broadcasting Co.* (1976), 86 Wash. 2d 439, 546 P.2d 81.

tunity to interpret the rulings of the United States Supreme Court which established that differing standards of care were applicable to various classes of defamation plaintiffs. The court there initially found that the summary judgment evidence failed to establish that plaintiff was a "public figure" or that the allegedly libelous statements related to his official conduct. The court then went on to determine whether the plaintiff's right of recovery against the media defendant as a private person depended upon the *New York Times* standard. In deciding that the actual malice standard did not apply, the *Foster* court reviewed *Gertz* and concluded that the effect of the ruling was to sanction a simple negligence standard as being in compliance with the minimum requirements of the first and fourteenth amendments.

The trend which began in the 1970's immediately following *Gertz* continued into the next decade. Based upon our research, we found that only a couple of States chose to join with Colorado and Indiana in applying the actual malice standard to defamation actions against media defendants where the libelous statements involved a matter of public or general concern and the plaintiff was a private person. (See *Gay v. Williams* (D.C. Alaska 1979), 486 F. Supp. 12 (applying Alaska law); *Sisler v. Gannett Co.* (1986), 104 N.J. 256, 516 A.2d 1083.) We also determined that other States have vacillated on the issue. Compare *Bichler v. Union Bank & Trust Co.* (6th Cir. 1984), 745 F.2d 1006 (applying Michigan law), with *Rouch v. Enquirer & News* (1984), 137 Mich. App. 39, 357 N.W.2d 794; compare *Gazette, Inc. v. Harris* (1985), 229 Va. 1, 325 S.E.2d 713, with *Great Coastal Express, Inc. v. Ellington* (1985), 230 Va. 142, 334 S.E.2d 846.

New York has continued to apply the "gross irresponsibility" standard in such cases. See *Karaduman v. Newsday, Inc.* (1980), 51 N.Y.2d 531, 416 N.E.2d 557; *Ortiz v. Valdescatilla* (N.Y. App. Div. 1984), 102 A.D.2d 513, 478 N.Y.S.2d 895.

However, like earlier decisions, the great majority of the States either have chosen to continue to use the negligence standard or have since adopted the negligence standard of fault in a defamation action involving a private plaintiff against a media defendant. The State courts generally have found that such a plaintiff is entitled to recover if he establishes that the defendant was negligent in publishing false and defamatory statements about him. See, *e.g., Antwerp Diamond Exchange of America, Inc. v. Better Business Bureau of Maricopa County, Inc.* (1981), 130 Ariz. 523, 637 P.2d 733; *Little Rock Newspapers, Inc. v. Dodrill* (1983), 281 Ark. 25, 660 S.W.2d 933; *Brown v. Kelly Broadcasting Co.* (1989), 48 Cal. 3d 711, 257 Cal. Rptr. 708, 771 P.2d 406; *Gannett Co. v. Re* (Del. 1985), 496 A.2d 553; *Phillips v. Eve-*

*ning Star Newspaper Co.* (D.C. 1980), 424 A.2d 78; *Miami Herald Publishing Co. v. Ane* (Fla. 1984), 458 So. 2d 239; *Diamond v. American Family Corp.* (1988), 186 Ga. App. 681, 368 S.E.2d 350; *Triangle Publications, Inc. v. Chumley* (1984), 253 Ga. 179, 317 S.E.2d 534; *Kohn v. West Hawaii Today, Inc.* (1982), 65 Haw. 584, 656 P.2d 79; *Jones v. Palmer Communications, Inc.* (Iowa 1989), 440 N.W.2d 884; *Vinson v. Linn-Mar Community School District* (Iowa 1984), 360 N.W.2d 108; *McCall v. Courier-Journal & Louisville Times Co.* (Ky. 1981), 623 S.W.2d 882; *Schrottman v. Barnicle* (1982), 386 Mass. 627, 437 N.E.2d 205; *Rouch v. Enquirer & News* (1986), 427 Mich. 157, 398 N.W.2d 245; *Jadwin v. Minneapolis Star & Tribune Co.* (Minn. 1985), 367 N.W.2d 476; *Brewer v. Memphis Publishing Co.* (5th Cir. 1980), 626 F.2d 1238 (applying Mississippi law); *Hyde v. City of Columbia* (Mo. Ct. App. 1982), 637 S.W.2d 251; *Madison v. Yunker* (1978), 180 Mont. 54, 589 P.2d 126; *McCusker v. Valley News* (1981), 121 N.H. 258, 428 S.E.2d 493; *Marchiondo v. Brown* (1982), 98 N.M. 394, 649 P.2d 462; *Walters v. Sanford Herald, Inc.* (1976), 31 N.C. App. 233, 228 S.E.2d 766; *Lansdowne v. Beacon Journal Publishing Co.* (1987), 32 Ohio St. 3d 176, 512 N.E.2d 979; *Anson v. Erlanger Minerals & Metals, Inc.* (Okla. App. 1985), 702 P.2d 393; *Bank of Oregon v. Independent News, Inc.* (1985), 298 Or. 434, 693 P.2d 35, rehearing denied, en banc (1985), 298 Or. 819, 696 P.2d 1095; *Rutt v. Bethlehems' Globe Publishing Co.* (1984), 335 Pa. Super. 163, 484 A.2d 72; *Jones v. Sun Publishing Co.* (1982), 278 S.C. 12, 292 S.E.2d 23; *Memphis Publishing Co. v. Nichols* (Tenn. 1978), 569 S.W.2d 412; *Seegmiller v. KSL, Inc.* (Utah 1981), 626 P.2d 968; *Great Coastal Express, Inc. v. Ellington* (1985), 230 Va. 142, 334 S.E.2d 846; *Caruso v. Local Union No. 690* (1987), 107 Wash. 2d 524, 730 P.2d 1299; *Crump v. Beckley Newspapers, Inc.* (W. Va. 1983), 320 S.E.2d 70; *Denny v. Mertz* (1982), 106 Wis. 2d 636, 318 N.W.2d 141.

■ The majority of these jurisdictions have adopted the negligence standard employed by section 580B of the Restatement (Second) of Torts, which states:

"One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he

(a) knows that the statement is false and that it defames the other,

(b) acts in reckless disregard of these matters, or

(c) acts negligently in failing to ascertain them." (Restate-

ment (Second) of Torts §580B (1977).)

In comment *c* to section 580B, the Restatement notes that while the Supreme Court's decision in *Gertz* requires some showing of fault with respect to private persons, the *Gertz* decision also states that a showing of negligence would be sufficient. The Restatement postulates that in view of the fact that the common-law rule had been one of strict liability, most State courts would adopt the least burdensome standard of fault permissible, *i.e.*, negligence. Restatement (Second) of Torts §580B, comment *c* (1977).

The rationale for adopting the negligence standard falls into four general areas. "The first, and most common theme, is that 'reputational interests command constitutional protection.' The second is that nothing in the state law requires a stricter standard. The third [rationale] *** is that the private person who has been defamed should be allowed recovery as easily as constitutionally permissible. The fourth theme is that the press can be demogogic and ought not be given additional power." *KARK-TV v. Simon* (1983), 280 Ark. 228, 238, 656 S.W.2d 702, 707.

Having reviewed the law of defamation in other jurisdictions, we now turn to the law of defamation in Illinois. Unlike our discussion above, we will review the common-law principles prior to *Gertz* and as modified by the constitutional limitations and rules announced therein.

### II. ILLINOIS LAW

■ In Illinois, a statement is considered defamatory if it impeaches a person's integrity, human decency, respect for others or reputation and thereby lowers that person in the eyes of the community (see *Cerveny v. Chicago Daily News Co.* (1891), 139 Ill. 345, 354, 28 N.E.2d 692), as the gravamen of an action for defamation is damage to the plaintiff's reputation in the eyes of other persons. (See *Harris Trust & Savings Bank v. Phillips* (1987), 154 Ill. App. 3d 574, 578, 506 N.E.2d 1370.) Each case must be decided upon its own facts because there is no clear rule for determining whether language is defamatory. See generally *Bruck v. Cinotta* (1977), 56 Ill. App. 3d 260, 371 N.E.2d 874. See also *Van Duyn v. Smith* (1988), 173 Ill. App. 3d 523, 527 N.E.2d 1005.

■ ■ All distinctions between libel and slander for the most part have been abolished, and the rules which apply to slander likewise apply to libel. Defamatory statements are classified as either libel *per se* or *per quod*. (See *Cook v. East Shore Newspapers, Inc.* (1945), 327 Ill. App. 559, 64 N.E.2d 751.) Libel *per se* is generally defined as words which are so obviously and naturally harmful to the

person that proof of their injurious character is unnecessary. See *Reed v. Albanese* (1966), 78 Ill. App. 2d 53, 223 N.E.2d 419.

Under Illinois common law, our courts have determined that there are four categories of words which constitute libel *per se*: (1) those imputing the commission of a criminal offense; (2) those imputing infection with a communicable disease of any kind which, if true, would tend to exclude one from society; (3) those imputing inability to perform or want of integrity in the discharge of duties of office or employment; and (4) those prejudicing a party in his profession or trade. (See *Bontkowski v. Chicago Sun-Times* (1969), 115 Ill. App. 2d 229, 252 N.E.2d 689.) Once it is determined that written or printed words are actionable *per se* or libelous *per se*, plaintiff has the right to a cause of action for defamation without proof of malice and without a showing of special damages, as both malice and damages are presumed. (*Lorillard v. Field Enterprises, Inc.* (1965), 65 Ill. App. 2d 65, 78, 213 N.E.2d 1. Accord *Fried v. Jacobson* (1983), 99 Ill. 2d 24, 457 N.E.2d 392.) A writing constitutes libel *per quod* if it requires an innuendo to give it a libelous meaning, in which case plaintiff must allege and prove special damages to sustain the cause of action. See *Whitby v. Associates Discount Corp.* (1965), 59 Ill. App. 2d 337, 207 N.E.2d 482.

However, an exception has been carved out wherein words that would otherwise be actionable may be considered as privileged. (See *Larson v. Doner* (1961), 32 Ill. App. 2d 471, 178 N.E.2d 399.) A privileged communication is one which because of the occasion on which or the circumstances under which it is made is not regarded as defamatory and actionable. (*Judge v. Rockford Memorial Hospital* (1958), 17 Ill. App. 2d 365, 376-77, 150 N.E.2d 202.) Privileged communications are divided into two classes: (1) absolutely privileged communications and (2) conditionally or qualified privileged communications. See *Zeinfeld v. Hayes Freight Lines, Inc.* (1968), 41 Ill. 2d 345, 243 N.E.2d 217.

The classification of absolutely privileged communications is narrow and is almost exclusively limited to legislative and judicial proceedings and other acts of the State. (See *Cook v. East Shore Newspapers, Inc.* (1945), 327 Ill. App. 559, 64 N.E.2d 751.) Conditionally or qualified privileged communications are recognized under the Illinois common law where there is a showing: (1) of good faith by the defendant; (2) of an interest to be protected or upheld; (3) that the statement is limited in its scope to that purpose; (4) that the publication is made on a proper occasion; and (5) that the publication is made in the proper manner and to the proper parties only. See

*Zeinfeld v. Hayes Freight Lines, Inc.* (1968), 41 Ill. 2d 345, 243 N.E.2d 217.

 Most often, the qualified privileges are raised as affirmative defenses by defendants and are exerted in defense of reports of legislative and judicial and other official proceedings. (See generally *Windsor Lake, Inc. v. WROK* (1968), 94 Ill. App. 2d 403, 236 N.E.2d 913.) In particular, Illinois courts have held that under the common-law privilege to report on judicial proceedings, such communication is privileged, if it is accurate and complete as a fair summary of the proceedings and is not made solely for the purpose of causing harm to the person defamed. (See *Newell v. Field Enterprises, Inc.* (1980), 91 Ill. App. 3d 735, 415 N.E.2d 434.) Similarly, a newspaper defendant is privileged to report executive and legislative activities if such report is a fair abridgment of such proceedings and is not made solely for the purpose of causing harm to the person defamed. (See *Coursey v. Greater Niles Township Publishing Corp.* (1968), 40 Ill. 2d 257, 239 N.E.2d 837.) In all such cases, the publications are deemed privileged as a matter of law (see *Lulay v. Peoria Journal-Star, Inc.* (1966), 34 Ill. 2d 112, 214 N.E.2d 746); however, the qualified or conditionally privileged publication loses its character as such upon proof of actual malice. See *Zeinfeld*, 41 Ill. 2d 345, 243 N.E.2d 217.

 It is also well settled that Illinois courts have traditionally recognized that where matters of public interest and concern were legitimate subjects of comment and criticism by a newspaper, publications of these matters were to be considered privileged, as long as fairly done and with an honest purpose. (*Kulesza v. Chicago Daily News, Inc.* (1941), 311 Ill. App. 117, 123-24, 35 N.E.2d 517.) This privilege, also known as the privilege of "fair comment," is the basis upon which the *Farnsworth* decision was decided. Further, defendants here rely extensively on the privilege of "fair comment" and *Farnsworth* as the crux of their argument. We will discuss the case in more detail below.

We have discussed and reviewed the development of defamation law in Illinois, in other jurisdictions since *Gertz*, and on the Federal level. In light of that review and discussion, we now look to the specific questions of law on this appeal as to which there are substantial grounds for differences in opinion.

### III. ISSUES

Although there are only two questions of law certified to us by the circuit court, we believe this appeal raises several subissues within those questions of law. The first question involves whether

*Farnsworth* (43 Ill. 2d 286, 253 N.E.2d 408) and *Chapski* (92 Ill. 2d 344, 422 N.E.2d 195) require application of the "actual malice" standard to these facts. As noted previously, *Farnsworth* primarily involves the qualified privilege of "fair comment." However, *Chapski* almost exclusively concerns the application of the "innocent construction rule." Accordingly, we believe that each of those cases must be treated and analyzed separately.

### A. *FARNSWORTH V. TRIBUNE CO.*

In 1969, the Illinois Supreme Court decided the case of *Farnsworth v. Tribune Co.* (1969), 43 Ill. 2d 286, 253 N.E.2d 408. In *Farnsworth*, defendants, the Tribune Co., had published a report to the general public which described plaintiff, an osteopathic physician, as a "quack." The court there found that the plaintiff was required to prove actual malice because "[i]n our judgment the conclusion is inescapable from *Times, Garrison, Butts* and other cases previously cited that the defendants in this case must be accorded at least the same degree of immunity accorded the defendant in *Butts*. Medical quackery is an area of critical public concern *** 'about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.' " *Farnsworth*, 43 Ill. 2d at 291, quoting *Butts*, 388 U.S. at 147, 18 L. Ed. 2d at 1106, 87 S. Ct. at 1987.

Defendants assert that *Farnsworth* established a common-law privilege for publications concerning public health and medical quackery. They argue that by creating this qualified privilege in *Farnsworth*, the Illinois Supreme Court balanced the competing interests involved in most libel actions: the right of a person defamed to recover for injury to his or her reputation and the need for vigorous and uninhibited debate and discussion on matters of public concern. However, plaintiff asserts that the entire basis for defendants' argument that he is required to prove actual malice to overcome the qualified privilege established in *Farnsworth* is predicated upon the supposition that the *Farnsworth* principle remains valid, and that it does not.

Defendants maintain that the basis of the *Farnsworth* holding is not that a doctor is a "public figure" or "public official"; rather, the controlling question is whether a public issue is involved. However, as asserted by plaintiff, the *Farnsworth* court reached its conclusion, in part, by reference to the public figure analysis of *New York Times*, and in part by reference to the analysis of the Supreme Court in *Rosenblatt v. Baer* (1966), 383 U.S. 75, 15 L. Ed. 2d 597, 86 S. Ct. 669

(concurring opinion). *Rosenblatt* later formed the basis for the reasoning in *Rosenbloom* (403 U.S. 29, 29 L. Ed. 2d 296, 91 S. Ct. 1811), where it was stated:

"If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual *** did not 'voluntarily' choose to become involved." (*Rosenbloom*, 403 U.S. at 43, 29 L. Ed. 2d at 311, 91 S. Ct. at 1819.)

However, as noted above, the *Gertz* court expressly rejected the *Rosenbloom* "public issue" analysis when it commented:

"The extension of the *New York Times* test proposed by the *Rosenbloom* plurality would abridge this legitimate state interest to a degree that we find unacceptable. And it would occasion the additional difficulty of forcing state and federal judges to decide on an *ad hoc* basis which publications address issues of 'general or public interest' and which do not—to determine, in the words of MR. JUSTICE MARSHALL, 'what information is relevant to self-government.' [Citation.]" (*Gertz*, 418 U.S. at 346, 41 L. Ed. 2d at 809, 94 S. Ct. at 3010.)

Moreover, the Court went on to state:

"The 'public or general interest' test for determining the applicability of the *New York Times* standard to private defamation actions inadequately serves both of the competing values at stake. On the one hand, a private individual whose reputation is injured by defamatory falsehood that does concern an issue of public or general interest has no recourse unless he can meet the rigorous requirements of *New York Times*. *** On the other hand, a publisher or broadcaster of a defamatory error which a court deems unrelated to an issue of public or general interest may be held liable in damages even if it took every reasonable precaution to ensure the accuracy of its assertions." *Gertz*, 418 U.S. at 346, 41 L. Ed. 2d at 809, 94 S. Ct. at 3010.

Accordingly, we preliminarily would find that the *Gertz* Court in rejecting *Rosenbloom* likewise rejected the *Farnsworth* analysis. We reach this result by looking to the rationale in *Gertz* that a "public or general interest" test is not constitutionally necessary and is inadequate for deciding the legitimate interest of the State in protecting the private individual against defamatory falsehoods. Furthermore, we look to the language in *Gertz* which establishes that a private individual need not prove actual malice and that to extend the *New York Times* standard to private persons whenever an issue of general or public interest is involved would abridge to an unacceptable degree

the legitimate State interest in compensating private individuals for apparent injury to reputation. (See generally *Gertz*, 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997.) Consequently, we are inclined to agree with the plaintiff's contention that because *Farnsworth* has relied on the very basis which *Gertz* said was no longer necessary, the *Farnsworth* decision no longer has any validity, unless it has been reaffirmed as a matter of Illinois law.

Plaintiff asserts that *Farnsworth* no longer has any validity after *Gertz*. He maintains that his position is further supported by our supreme court decision in *Troman v. Wood* (1975), 62 Ill. 2d 184, 340 N.E.2d 292. Conversely, defendants contend that the *Troman* court did not cite, much less distinguish or overrule, *Farnsworth* and that *Troman* contains a limitation which states the "holding in the present case is, of course, not intended to remove any of the absolute or qualified privileges which have heretofore been recognized in this State." (62 Ill. 2d at 198.) Thus, defendants argue that the qualified privilege established in *Farnsworth* remains valid. Defendants further maintain that *Farnsworth* has been expressly reaffirmed by the Illinois Supreme Court on three occasions since *Troman* was decided (see *Chapski v. Copley Press* (1982), 92 Ill. 2d 344, 442 N.E.2d 195; *Colson v. Stieg* (1982), 89 Ill. 2d 205, 433 N.E.2d 246; *People v. Heinrich* (1984), 104 Ill. 2d 137, 470 N.E.2d 966), and thus, *Farnsworth* continues to require doctors to prove actual malice, at least when the news reports of which they complain are linked to their services or fees. We will begin with a review of *Troman*.

In the case of *Troman*, the court enunciated that the central issue on appeal concerned "the standard of liability which should be imposed for libel in the light of the recent decision of the Supreme Court of the United States in *Gertz v. Robert Welch, Inc.* [citation.]" (*Troman*, 62 Ill. 2d at 188.) Following a discussion of the "applicable constitutional limitations laid down by the Supreme Court" prior to *Gertz*, the court then commented that "[t]he opinion in *Gertz* rejected the proposition advanced in *Rosenbloom* that actual malice must be proved even as to a defamatory falsehood about a private individual, if the statement related to matters which a court deemed of public or general interest. [Citation.]" (*Troman*, 62 Ill. 2d at 192.) The court further stated that the Federal Constitution did not require Illinois to apply the actual malice standard of liability of *New York Times*, and that the adoption of such a standard could not be justified on the theory that such a requirement furthered some overriding public policy of Illinois, since prior to the *New York Times* rule, it was not considered that liability for defamation required any showing of fault at all,

let alone proof of actual malice.

The court further noted that the Constitution of Illinois provided for the right of protecting reputation as a fundamental right. In reviewing the balance to be reached in light of the competing interest of freedom of speech, the court opined that provision likewise recognized the interest of the individual in the protection of his reputation, in that "the exercise of the right to speak freely shall not relieve the speaker from responsibility for his abuse of that right." *Troman*, 62 Ill. 2d at 195.

Defendant had urged the court to adopt the actual malice standard as a matter of State policy. In rejecting such a standard, the court discussed at some length the difficulty of courts in deciding whether a matter was one of public interest. The court further commented that "[o]ur adoption of negligence rather than actual malice as a standard is in accord with several decisions in other States which were rendered since *Gertz*. [Citations.]" *Troman*, 62 Ill. 2d at 198.

The *Troman* court then concluded:

> "We hold, therefore, that in a suit brought by a private individual to recover actual damages for a defamatory publication whose substantial danger to reputation is apparent, recovery may be had upon proof that the publication was false, and that the defendant either knew it to be false, or, believing it to be true, lacked reasonable grounds for that belief. We hold further that *negligence may form the basis of liability regardless of whether or not the publication in question related to a matter of public or general interest.*" (Emphasis added.) *Troman*, 62 Ill. 2d at 198.

However, as noted previously, the court added a limitation that its holding was not intended to remove any absolute or qualified privileges formerly recognized in Illinois. It is precisely this language which has caused some of the problems among the Illinois courts in determining which standard applies where the plaintiff is considered to be a private person, and the alleged defamatory statement relates to a matter of public or general interest, and which privilege, if any, is applicable under such circumstances as a matter of law.

Thus, a plain reading of both *Farnsworth* and *Troman* raises some conflicting and contradictory concerns. For example, does *Troman* stand for the general proposition that all private plaintiffs are required to prove mere negligence in defamation actions brought against (media) defendants, even where a public matter is involved? We answer this question in the affirmative with the caveat that no privilege applies therein to defeat the rule. The next question then be-

comes what privilege(s) will defeat the *Troman* rule; and if the privilege so defeats the rule, whether a private plaintiff is then required to prove actual malice or some other standard to overcome the privilege(s). The last question is whether the *Farnsworth* privilege is included in this category, and whether that privilege remains one of "fair comment," or is more narrow in scope and limited only to the subject matter of medical treatment. Before we reach a conclusion, we must look to the law in Illinois after *Farnsworth* and *Troman*.

### 1. POST-*FARNSWORTH* CASES

Our research has found 15 references to the *Farnsworth* case where it was cited in either a majority, concurring or dissenting opinion. In two instances, it was cited to in related cases. See, *e.g., Berkos v. National Broadcasting Co.* (1987), 161 Ill. App. 3d 476, 515 N.E.2d 668 (modified on denial of rehearing on November 5, 1987); *Davis v. Keystone Printing Service, Inc.* (1987), 155 Ill. App. 3d 309, 507 N.E.2d 1358 (second appeal following remand (1982), 111 Ill. App. 3d 427, 444 N.E.2d 253).

In *J.L.S. Snead v. Forbes, Inc.* (1971), 2 Ill. App. 3d 22, 275 N.E.2d 746, the court agreed that under the *New York Times* rule, constitutional guarantees of freedom of speech and press extended to "matters of public interest." The court quoted from *Farnsworth* and concluded based thereon that "the challenged articles describing a prominent business executive in a vitally important industry were fair comment on 'matters of public interest' dealing with a 'public figure.'" (*Forbes*, 2 Ill. App. 3d at 27.) In *Basarich v. Rodeghero* (1974), 24 Ill. App. 3d 889, 321 N.E.2d 739, the court commented that Illinois courts had brought such people as doctors within the parameter of the *New York Times* rule. Thus, in reliance upon the *Rosenblatt* analysis, the court found that public school teachers and coaches, and the conduct of such persons and their policies, were of as much concern to the community as were other public officials and public figures. *Basarich*, 24 Ill. App. 3d at 892.

The remaining appellate court cases that we reviewed were decided after *Gertz*. Five of these cases which we will discuss shortly cite to both *Farnsworth* and *Troman*. The remaining cases either distinguish *Farnsworth* or discuss it in a very limited context or for a relatively minor proposition. For example, in *Welch v. Chicago Tribune Co.* (1975), 34 Ill. App. 3d 1046, 340 N.E.2d 539, the first district distinguished *Farnsworth* when it concluded that the case "at bar does not concern public figures or issues, rather it concerns an employer's publication of a memorandum explaining the termination of

his employee—a private person." (*Welch*, 34 Ill. App. 3d at 1053.) Similarly, the court in *Korbar v. Hite* (1976), 43 Ill. App. 3d 636, 357 N.E.2d 135, interpreted the *Farnsworth* plaintiff as a "limited public figure" because the publication there concerned a matter of vital importance. By using such a rationale, the court concluded it was justified in finding its plaintiff, an elected president of a credit union, to be a limited public figure. *Korbar*, 43 Ill. App. 3d at 641.

The other references are minor. See, *e.g., Rozier v. St. Mary's Hospital* (1980), 88 Ill. App. 3d 994, 1008, 411 N.E.2d 50 (*Farnsworth* cited to in dissenting opinion for proposition that a "constitutional guarantee is not limited expressly to politics or matters of public concern"); *American International Hospital v. Chicago Tribune Co.* (1985), 136 Ill. App. 3d 1019, 1022, 483 N.E.2d 965 (quoting from *Farnsworth*, 43 Ill. 2d at 293, *inter alia*, that although truth is a defense to a defamation action, only substantial truth is required for this defense); *Berkos v. National Broadcasting Co.* (1987), 161 Ill. App. 3d 476, 494, 515 N.E.2d 668 (plaintiff required to plead and prove the falsity of the alleged defamatory statements made about him by NBC and Karl); *Mittelman v. Witous* (1988), 171 Ill. App. 3d 691, 705, 525 N.E.2d 922 (statement not a constitutionally protected opinion because the subject of the statement was not an area of critical concern within the meaning of *Farnsworth*).

Similarly, contrary to defendants' assertions, two of the three Illinois Supreme Court references to *Farnsworth* do not affirm the principles articulated therein. First, neither *Chapski* nor *Heinrich* fully discusses the qualified privilege at issue in *Farnsworth*. *Chapski* generally cites to *Farnsworth* within the context of "the availability of privileges and broader protections that now exist to protect first amendment interests," as part of its rationale to modify the innocent construction rule. (*Chapski*, 92 Ill. 2d at 351.) Defendants urge that this reference alone demonstrates the supreme court's intention of reaffirming the privilege. However, we do not agree with this blanket statement and conclude that such reference adds little to the discussion of the distinctions which we believe are relevant here. *Heinrich*, which involves criminal defamation, refers to *Farnsworth* for the proposition that where the *Times* standard applies, the burden of proving truth must not be placed upon the defendant. *Heinrich*, 104 Ill. 2d at 146.

However, we did find two cases which significantly impact our discussion here. One of the cases is an Illinois Supreme Court case (*Colson v. Stieg* (1982), 89 Ill. 2d 205, 433 N.E.2d 246), and the other was rendered by the Second District of the Illinois Appellate Court (*Davis*

*v. Keystone Printing Service, Inc.* (1987), 155 Ill. App. 3d 309, 507 N.E.2d 1358). Defendants urge that the Illinois Supreme Court in *Colson* has solved the *Farnsworth* and *Troman* dilemma and has concluded that *Farnsworth* is applicable in situations where a public issue or concern is involved. However, we are not so inclined to accept this proposition. We believe that the defendants' reliance on *Colson* is misplaced. Further, we believe that *Colson* contains several limitations and exceptions, as pointed out in *Davis*, which distinguish that case factually and analytically from the case at bar. We will analyze both of these cases in greater detail following our discussion of the trend of the post-*Troman* cases.

### 2. POST-*TROMAN* CASES

Our research has found that the majority of the appellate court cases which cite to *Troman* refer to particular propositions that can be grouped into five general areas as follows: (1) libel counts in the complaint were or were not legally sufficient (*Wilson v. Hunk* (1977), 51 Ill. App. 3d 1030, 1035-36, 367 N.E.2d 478; *Millsaps v. Bankers Life Co.* (1976), 35 Ill. App. 3d 735, 744, 342 N.E.2d 329); (2) *Troman* is not a departure from the "innocent construction rule" (*Berkos v. National Broadcasting Co.* (1987), 161 Ill. App. 3d 476, 485, 515 N.E.2d 668; *American International Hospital v. Chicago Tribune Co.* (1983), 120 Ill. App. 3d 435, 441, 458 N.E.2d 1305; *Levinson v. Time, Inc.* (1980), 89 Ill. App. 3d 338, 343, 411 N.E.2d 1118; *Vee See Construction Co. v. Jensen & Halstead, Ltd.* (1979), 79 Ill. App. 3d 1084, 1087, 399 N.E.2d 278; *Makis v. Area Publications Corp.* (1979), 77 Ill. App. 3d 452, 459, 395 N.E.2d 1185 (refers to a comment in the dissenting opinion that the "innocent construction rule" is no longer needed now that strict liability has been ruled unconstitutional); *Cooper v. Rockford Newspapers, Inc.* (1977), 50 Ill. App. 3d 247, 248-49, 365 N.E.2d 744); (3) *Troman* adopts the *Gertz* definition of actual damages (*Brown v. Farkas* (1986), 158 Ill. App. 3d 772, 779, 511 N.E.2d 1143; *Matviuw v. Johnson* (1979), 70 Ill. App. 3d 481, 486, 388 N.E.2d 795; *Halpern v. News-Sun Broadcasting Co.* (1977), 53 Ill. App. 3d 644, 653, 368 N.E.2d 1062 (further notes that a private plaintiff can't recover punitive damages absent a showing of actual malice); (4) states the definition of actual malice (*Erickson v. Aetna Life & Casualty Co.* (1984), 127 Ill. App. 3d 753, 764, 469 N.E.2d 679; *Angelo v. Brenner* (1980), 84 Ill. App. 3d 594, 597, 406 N.E.2d 38; see also *Ware v. Carey* (1979), 75 Ill. App. 3d 906, 394 N.E.2d 690); and (5) Illinois follows *Gertz* or has chosen the standard of negligence in cases involving private individuals, but entertains little or no discus-

sion (*Owens v. CBS, Inc.* (1988), 173 Ill. App. 3d 977, 994, 527 N.E.2d 1296; *Dauw v. Field Enterprises, Inc.* (1979), 78 Ill. App. 3d 67, 71, 397 N.E.2d 41; see also *Van Duyn v. Smith* (1988), 173 Ill. App. 3d 523, 533, 527 N.E.2d 1005 (court found although *Troman* had been somewhat eroded in limited circumstances (*e.g., Colson*, 89 Ill. 2d 205, 433 N.E.2d 246), the negligence standard, rather than actual malice, was applicable therein); *Tunney v. American Broadcasting Co.* (1982), 109 Ill. App. 3d 769, 776-77, 441 N.E.2d 86 (court adopted the negligence standard and further commented that "reasonable grounds" is generally a question of fact)).

Other appellate court cases have discussed *Troman* more fully. In *Nagib v. News-Sun* (1978), 64 Ill. App. 3d 752, 755, 381 N.E.2d 1014, the court first acknowledged *Gertz*, and then recognized that *Troman* had established a negligence standard for private plaintiffs in Illinois as a result of that opinion. However, in light of the *Troman* limitation, *Nagib* concluded that plaintiff, a doctor, had not made sufficient allegations in count I of his complaint to demonstrate defendants were motivated by actual malice towards him in their report to overcome defendants' common-law qualified privilege to report the court proceedings in which the plaintiff had participated. (Accord *Dark v. United States Fidelity & Guaranty Co.* (1988), 175 Ill. App. 3d 26, 35-36, 529 N.E.2d 662 (where this court found that, as a matter of law, defendants' libelous statement was qualifiedly privileged).) However, in *Newell v. Field Enterprises, Inc.* (1980), 91 Ill. App. 3d 735, 758, 415 N.E.2d 434, the court concluded that plaintiff, as private person, was required to prove that publication of the article was negligence. Several references were made to *Troman* throughout the opinion.

Similar to our observations regarding the post-*Farnsworth* supreme court cases, neither *Chapski* nor *Heinrich* offers very much assistance to this discussion. *Chapski* simply comments that *Troman* should be compared with *John v. Tribune Co.* (1962), 24 Ill. 2d 437, 181 N.E.2d 105. (But compare *Chapski* with *Catalano v. Pechous* (1980), 83 Ill. 2d 146, 419 N.E.2d 350 (where Justice Clark, concurring in part and dissenting in part, states that the standard enunciated in *Troman* can't be reconciled with the standard announced in *John*).) *Heinrich* states that pursuant to *Gertz*, States are not limited by the strict *New York Times* standard. (*Heinrich*, 104 Ill. 2d at 148.) In addition, Justice Clark makes a general reference to *Troman* in his dissent in a supplemental opinion on denial of rehearing in the supreme court decision of *Lopez v. Fitzgerald* (1979), 76 Ill. 2d 107, 137, 390 N.E.2d 835.

Which brings us to the remaining two cases mentioned earlier, *Colson* and *Davis*. In *Colson*, an assistant professor sued his department chairperson for remarks he made to the department's personnel committee and the university personnel committee. The committees were evaluating Colson's performance and deciding whether he should be granted tenure. The court there did not determine whether Colson was a private or public figure. However, it followed *Farnsworth* because the case qualified "under the *Butts* test as a subject about which information is needed or appropriate to enable the members of the committee to cope with the issues confronting them." *Colson*, 89 Ill. 2d at 213.

The *Colson* court acknowledged the competing interests involved and concluded that the *New York Times* rule assured the proper breathing space essential to the exercise of freedoms of speech and press. In mentioning *Gertz*, the *Colson* court found that in order to reach the accommodation referred to therein, "the challenged statement must be assessed in the context in which it was published" because the extent of the publication and its effect upon its recipients are of primary consideration. *Colson*, 89 Ill. 2d at 212.

Thus, *Colson* suggested a new rule altogether to trigger the constitutional privileges—not whether a public official, public figure, private individual; or public interest was involved, but the manner and arena in which the statement itself was published. In this manner, *Colson* avoided the private figure and public issue analysis and was able to rationalize that the complained-of statements fell within the purview of the *New York Times* and *Farnsworth* holdings, where it stated "the publication was made to a very \*\*\* specialized group. All of the compelling reasons for applying \*\*\* *New York Times* are present in this case, especially the necessity for free and uninhibited discussion and the need to avoid self-censorship." (*Colson*, 89 Ill. 2d at 212.) However, just as *Troman* failed to mention *Farnsworth*, and as a consequence the public interest test was revisited in *Colson*, the majority in *Colson* did not mention *Troman*, and as a result has left a void in the discussion of the private figure/public issue analysis.

In a special concurrence, Justice Clark stated that "*New York Times* simply does not apply to this case." (*Colson*, 89 Ill. 2d at 216 (Clark, J., concurring).) He went on to comment that the plaintiff's status as a public figure, to whom the actual malice standard applies, "or as a private figure, to whom the standard does not apply, is the key factor in the United States Supreme Court's analysis of first amendment constraints on State-law remedies for [defamation]. [Citations.]" (*Colson*, 89 Ill. 2d at 217 (Clark, J., concurring).) Justice Clark

further stated that there is no Federal constitutional reason why a plaintiff cannot recover actual damages in a defamation action upon a showing of defendant's negligence, as the private defamation plaintiff's right to recover would still be limited by the common-law doctrine of qualified privilege.

In *Davis*, plaintiff, a minister, was president of Christian Fellowship, Inc., a tax-exempt religious organization. He brought a libel action against defendants, Keystone Printing Service, Inc., publisher of the *News-Sun*, and Adrienne Drell, a reporter for the newspaper, based on a series of articles published in defendants' newspapers. On defendants' motion for summary judgment, the trial court found plaintiff to be a limited purpose public figure and that the articles concerned matters of public concern. The trial court found plaintiff was required to prove malice on the part of defendants and that there was no evidence from which a finding of malice could be made by a trier of fact. Thus, the trial court granted summary judgment for defendants. This court reversed the trial court's decision, finding that plaintiff was a private individual.

On appeal, the *Davis* defendants had argued that Illinois requires proof of actual malice where the subject area concerns a matter of public interest or concern. Although the court there recognized that the defendants' argument was supported to some extent by Illinois case law, it also noted that Illinois decisions were inconsistent in this area. The court then distinguished *Farnsworth*, stating that the *Farnsworth* decision had relied on pre-*Gertz* cases for the basis of its proposition that statements concerning matters of public interest trigger constitutional protection, while the Supreme Court in *Gertz*, which was decided after *Farnsworth*, explicitly rejected this "public interest" or concern test for constitutional protection. We agree with the *Davis* conclusion.

Moreover, the *Colson* court itself recognized that a different result might be appropriate where the plaintiff had no access to the channels of communication to refute the false statements. The court stated:

> "If the defendant in our case would have published the statement in question to the public in general, it is possible that the plaintiff would not have had sufficient access to the channels of communication to overcome or offset the damaging effect of defendant's statement. We make no assessment *** of the use of the *New York Times* privilege in such a situation." (*Colson*, 89 Ill. 2d at 214.)

Here, defendants distributed the defamatory statements to the gen-

eral public and republished them in a special reprint booklet. Like the *Davis* case, no attempts were made to limit the information.

Furthermore, we agree with the *Davis* court and "do not construe the *Colson* opinion to mean that the *New York Times constitutional* privilege is afforded a media defendant simply because a defamatory statement concerns an item of 'public interest.' The *Gertz* court had specifically rejected that notion, as was made clear in later Supreme Court cases. (See, *e.g., Time, Inc. v. Firestone* (1976), 424 U.S. 448, 47 L. Ed. 2d 154, 96 S. Ct. 958.) Any item in a newspaper is arguably one of public interest. Rather we read *Colson* as requiring proof of malice as a matter of *common law* privilege in light of the limited extent of the publication, plaintiff's opportunity for rebuttal, and the need for the information by the evaluation committees, but not as a matter of constitutional law. [Citation.]" (*Davis*, 155 Ill. App. 3d at 318.) Moreover, *Colson* involved the common-law privilege of common or shared interest.

■■ Accordingly, in our opinion, *Davis* expresses the better view to be followed under the present factual matrix. While we recognize that some decisions, *i.e., Nagib* and *Dark*, which were discussed previously, have concluded that the plaintiffs therein were required to prove actual malice based upon the existence of a common-law qualified privilege, we believe that the privileges involved in those instances were among those common-law privileges meant to remain intact following *Gertz* and *Troman*. However, it is our belief that the constitutional privilege at issue in *Gertz*, that is, the test of "public interest," should no longer be available as the mechanism by which media defendants avoid liability. As earlier stated, any item is arguably one of public interest.

We do, however, recognize one inherent problem here. In some jurisdictions, the "public interest" privilege arose as a matter of constitutional privilege following *New York Times*. In Illinois, the "public interest" privilege began as a creature of the common-law qualified privilege, and also formed the basis of the "fair comment" privilege present in *Farnsworth*. Thus, while the "public interest" test may not be constitutionally required, the question becomes whether it nevertheless may be applied as a matter of common law in Illinois.

■■ Acknowledging the divergent views among the districts of the appellate court, we hesitate to issue a general resounding negative response. However, in accordance with *Troman*, we conclude that such an application is unwarranted here, where a private plaintiff and a media defendant are involved, notwithstanding the presence of a "public interest." We reach this result in light of (1) the hypothesis

upon which *Gertz* stands, (2) the Illinois Supreme Court's decision in *Troman*, (3) the current trend of defamation law, and (4) the prevailing view in a substantial majority of jurisdictions. Moreover, we agree with the supreme court of California:

> "The public-interest privilege sought by defendants would be contrary, at least in spirit, to the concept of a 'public figure' as developed by the courts since *Gertz*, [citation]. A person is not a public figure merely because he [is] involved in a controversy that is newsworthy. [Citation.] *** '[T]he mere involvement of a person in a matter which the media deems to be of interest to the public does not, in and of itself, require that such a person become a public figure for the purpose of a subsequent libel action.' [Citations.]" (*Brown v. Kelly Broadcasting Co.*, 48 Cal. 3d at 744, 257 Cal. Rptr. at 726-29, 771 P.2d at 426-27.)

Further, as our supreme court in *Troman* noted, a public interest privilege would undercut the widely recognized distinction between public and private persons.

The rationale for use of this privilege when a private plaintiff and a media defendant are involved is further lessened when weighed against society's interest in protecting an individual's reputation and good name and the media's ability to report the news. There must be a "proper accommodation between the law of defamation and the freedoms of speech and press." (*Gertz*, 418 U.S. at 325, 41 L. Ed. 2d at 789, 94 S. Ct. at 3000. "[T]echnology has immeasurably increased the power of the press to do both good and evil." (*Rosenbloom*, 403 U.S. at 60, 29 L. Ed. 2d at 321, 91 S. Ct. at 1828.) With the advent of cable television, facsimile machines, computers and satellite communication, the news is capable of being spread far and wide in a rapid fashion. As a result, the good news serves its proper place in educating and alerting its recipients. However, the evil news has an even more devastating effect upon its subject than it did years ago when strict liability was the rule in common-law defamation.

Readers, viewers and listeners have a right to receive valuable information without the threat of a "chilling effect" upon the media's eagerness to so report. The need to avoid self-censorship is likewise a high priority. However, one of the age-old purposes of the law of defamation has been to protect against abuses of the right to speak, write and publish freely falsehoods that harm another. "Defamation defendants now have a panoply of constitutional protections. *New York Times* has been characterized as 'overturning 200 years of libel law.' [Citations.]" (*Brown*, 48 Cal. 3d at 747, 257 Cal. Rptr. at 730, 771 P.2d at 428.) However, on the same accord, private persons enjoy less

of an opportunity than public officials and figures to counteract false-hoods, yet they are governed by "economic relationships [that] are likely to be based on an impersonal or reputational level as opposed to the more decentralized and personal approach characteristic of a by-gone era." (*Rouch v. Enquirer & News*, 427 Mich. at 201, 398 N.W.2d at 264.) Today, more so than 200 years ago, a person who is defamed in his business reputation has little or no opportunity to countermand the damage done when such publications reach actual or potential customers.

■■■ Accordingly, we believe that the fundamental reasons expressed by the United States Supreme Court in *Gertz* for rejecting application of a public interest test to private plaintiffs, when coupled with our supreme court's decision in *Troman* and the ever-present constitutional societal interest at stake for protecting injury to reputation, require that we reject the *Farnsworth* privilege in this case. We hold that the trial court's finding that plaintiff, as a private person, was not required to prove actual malice was proper. After a careful review of the law of defamation in general and in particular in Illinois, we believe that under the factual matrix here presented, plaintiff is required to allege and prove negligence. This result, however, answers only one prong of the two-part certified question. Thus, we must now determine whether the trial court properly applied *Chapski* to this case.

### B. *CHAPSKI V. COPLEY PRESS*

■■■ Under Illinois common law, in order to determine whether the alleged libelous statement falls within one of the classes of libel *per se*, our courts have long followed the "innocent construction rule." Under this rule, as modified in *Chapski*, a "written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning[,] [and] if, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff it cannot be actionable *per se*." (*Chapski*, 92 Ill. 2d at 352. See also *Costello v. Capital Cities Communications, Inc.* (1988), 125 Ill. 2d 402, 523 N.E.2d 790.) This preliminary determination is a question of law to be resolved by the trial court. Whether the publication was in fact understood to be defamatory or to refer to the plaintiff is a question of fact for the jury. *Chapski*, 92 Ill. 2d at 352, citing *Troman*, 62 Ill. 2d at 189. See also *Owens v. CBS, Inc.* (1988), 173 Ill. App. 3d 977, 527 N.E.2d 1296.

■■■ When a newspaper publication is involved, the headline and

news report to which it refers generally must be considered in their entirety, including the place and position of the item, to determine whether such publication is libelous under the innocent construction rule. See *Reed v. Albanese* (1966), 78 Ill. App. 2d 53, 223 N.E.2d 419. See also *Antonelli v. Field Enterprises, Inc.* (1983), 115 Ill. App. 3d 432, 450 N.E.2d 876.

In *Chapski*, plaintiff was a private attorney who brought a libel suit against media defendants based upon their publication of a series of newspaper articles which purported to summarize the judicial proceedings that preceded the death of a victim of child abuse. Plaintiff had represented the mother of the child in juvenile and divorce proceedings. The *Chapski* court first discussed the innocent construction rule, which arose from *obiter dictum* in *John v. Tribune Co.* (1962), 24 Ill. 2d 437, 181 N.E.2d 105, and the less than uniform application of the rule in the various appellate and supreme court decisions. The court then announced its modification of the "innocent construction rule" as noted earlier. *Chapski*, 92 Ill. 2d at 351.

Accordingly, like the court below, we look to the rule itself to determine whether or not the alleged defamatory statements may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff. (*Chapski*, 92 Ill. 2d at 352.) If we determine this answer to be in the affirmative, the finding of the circuit court must be deemed improper. However, like the court below, we believe the answer to be in the negative, and thus plaintiff's cause of action, if all other requirements are met, is actionable *per se.*

Plaintiff maintains that the words in the article of February 19, 1980, in conjunction with the reprint on March 11, 1980, clearly imply, in context, given their natural and obvious meaning, that he was part of the accident and medical insurance fraud, and that whether this meaning was in fact so understood by the readers is a determination to be made by a jury.

Defendants contend that despite the literal truth of everything reported, plaintiff is suing on the theory that he has been linked by implication, that is, the story implies assertions of some other facts, to a fraudulent insurance scheme. They cite to *Dauw v. Field Enterprises, Inc.* (1979), 78 Ill. App. 3d 67, 397 N.E.2d 41, as the closest case in point. In *Dauw*, the court found that the innocent construction rule bars the kind of liability by reference which the plaintiff here asserts. However, as defendants concede, and we so find, *Chapski* modifies *Dauw* and changes the definition of the innocent construction rule from whether one can construe a reasonable interpretation to whether

the words, considered in context and given their natural and obvious meaning, may reasonably be innocently interpreted.

Defendants urge that the natural and obvious meaning applied here is that Dr. Rosner was on the premises at Holy Name, that he saw patients sent to see Dr. Maloney or Dr. Graham, who were part of a fraud, and that he made no effort to set himself apart from them. Defendants further contend this meaning becomes defamatory only if the reader infers that Dr. Rosner was also involved in the fraud. Plaintiff contends that this argument takes the statements out of context and gives them a strained and unnatural meaning.

 It is well settled that statements made in the form of insinuation, allusion, irony or question may be considered as defamatory as direct assertions of fact. (See, e.g., Catalano v. Pechous (1980), 83 Ill. 2d 146, 419 N.E.2d 350.) Accordingly, we reject defendants' argument that the form of the statements renders them incapable of expressing a defamatory meaning.

Plaintiff next contends that an earlier opinion of the trial judge, which was issued in conjunction with his order of December 1982, denying defendants' motion for judgment on the pleadings, is the law of the case. There the judge determined (1) that the statements could not be held to be nonactionable per se, and (2) that there existed a genuine issue of material fact as to the truth or falsity of the publications. (See Lake Bluff Heating & Air Conditioning Supply, Inc. v. Harris Trust & Savings Bank (1983), 117 Ill. App. 3d 284, 452 N.E.2d 1361.) Thus, plaintiff asserts that this court has no jurisdiction to consider a modification or vacation of that determination by the trial judge.

 ██ Ordinarily, the law of the case doctrine applies in situations where questions of law were decided in a previous trial or a previous appeal, so as to be binding on the trial court or appellate court in a subsequent proceeding. (See Zokoych v. Spalding (1980), 84 Ill. App. 3d 661, 405 N.E.2d 1220.) Accordingly, we find no merit in plaintiff's argument after reviewing the procedural posture in which it was raised. However, in briefly addressing this contention, we turn our attention to Van Schaack v. Moody (1971), 3 Ill. App. 3d 43, 278 N.E.2d 145. Therein, this court found that the prior denial of a motion for summary judgment did not compel the conclusion that a genuine issue of material fact existed, so as to preclude the granting of a motion for judgment on the pleadings, where the prior ruling was not based on the existence of a fact issue but on the determination of a matter of law. By analogy, we believe that a prior ruling, denying a motion for judgment on the pleadings as a matter of law, does not

necessarily compel the conclusion that a genuine issue of material fact does exist so as to sanction the entry of an order denying a motion for summary judgment.

■ In applying the factors announced in *Chapski*, we find that the February 15, 1980, article, which did not refer to the plaintiff or mention him by name, and the photograph which accompanied this article and displayed plaintiff's name and specialty in the background but did not picture him, cannot reasonably be otherwise than innocently interpreted and cannot reasonably be interpreted as referring to the plaintiff. With regard to the February 19, 1980, article, we find that the statement "things weren't any more professional *** where a podiatrist examined one reporter's foot by feeling her boots" is not reasonably susceptible to an innocent construction and is to be considered libelous *per se* because it imputes to plaintiff a lack of ability in his profession as a podiatrist. The article also stated that plaintiff sent people to chiropractor Graham. This statement, when read in context with the statement that the "Rosner-Graham-Maloney triple threat went into action again," suggests that plaintiff was part of a fraudulent group. When we further consider the words in the headline and the name of the series, "The Accident Swindlers," in conjunction with the language that follows (See *Kulesza v. Chicago Daily News, Inc.* (1941), 311 Ill. App. 117, 35 N.E.2d 517), we believe the statements complained of impute plaintiff's involvement in the commission of a criminal offense.

Defendants next contend that the statements are either constitutionally protected opinions as to the professional manner in which the plaintiff inspected or examined the reporter's foot (see *Howell v. Blecharczyck* (1984), 119 Ill. App. 3d 987, 992, 457 N.E.2d 494), or colloquial statements which are nonactionable (*Greenbelt Cooperative Publishing Association v. Bresler* (1970), 398 U.S. 6, 14, 26 L. Ed. 2d 6, 15, 90 S. Ct. 1537, 1542). Under the common law of defamation, the "public interest" privilege was used to protect expressions of opinion. However, recent commentary has noted that the *Gertz* decision appears to have rendered an expression of opinion of the first or pure type unconstitutional. One example of an expression of an opinion of the first type exists in a situation where the maker states the facts on which he bases his opinion of the plaintiff and then expresses a comment as to the plaintiff's conduct, qualifications or character. Another example is where the maker does not express the alleged facts but makes a comment on assumed facts. The same commentary defines an expression of the mixed type as an expression which is apparently based on some facts regarding the plaintiff or his conduct that have

not been stated by the defendant but are assumed to exist by the parties to the communication. (See Restatement (Second) of Torts §566, Comments *a, b* (1977).) The Restatement concludes that under the latter circumstances, the defendant may be subject to liability. The rationale is that the second type of impression implies that there are undisclosed facts about the plaintiff that must be defamatory in character in order to justify the opinion and upon which the opinion is based. While we believe that the statements in question did not constitute expressions of opinion, assuming *arguendo* that they did, we would consider them to be of the second type and therefore subject to liability under the Restatement analysis. Neither do we consider the complained-of statements to constitute colloquial statements within the meaning of *Greenbelt* (398 U.S. at 14, 26 L. Ed. 2d at 15, 90 S. Ct. at 1543).

 Accordingly, we hold that the February 19, 1980, article taken alone, the March 11, 1980, special reprint, and the February 15, 1980, photograph, as republished in the reprint, may not reasonably be innocently interpreted. We believe that these statements, when considered in the context of the entire article or series of articles, may be interpreted by a reasonable reader to mean that the plaintiff had engaged in the illegal activity of defrauding insurance companies by providing unnecessary and unprofessional services and creating phony bills thereto in relation to nonexistent accidents. Thus, we find that the trial court below properly found that the statements were capable of a defamatory meaning, and thus, were actionable *per se* under the *Chapski* rule as a matter of law. Whether the publications are in fact understood to be defamatory or to refer to the plaintiff are questions of fact to be determined by the jury on remand.

## IV. SUMMARY JUDGMENT

Defendants contend that the trial court committed error in finding the existence of a genuine issue of material fact because it submitted undisputed affidavits and deposition transcripts in support of the motion for summary judgment, while plaintiff presented no evidence whatsoever to demonstrate a genuine issue of material fact. (See *Bennett v. Raaq* (1982), 103 Ill. App. 3d 321, 326, 431 N.E.2d 48, 54.) They maintain that the facts attested to by its affidavits and deposition transcripts which showed the reporters believed the truth of their stories must be accepted as true since the plaintiff did not contradict them with counteraffidavits or other evidence. They rely on *Wooding v. L & J Press Corp.* (1981), 99 Ill. App. 3d 382, 385-86, 425 N.E.2d 1055, to support this position. Specifically, defendants argue that no

genuine issue of material fact exists as to whether Rosner asked the reporters into his examining room, tested their reflexes, looked at their charts and asked questions, and ran his hand along Smith's boot.

Conversely, plaintiff maintains that the trial court properly denied the motion for summary judgment. He asserts that the second amended complaint clearly states the publications are defamatory. He argues that no purpose is to be served for him to repeat what is already set forth in the pleadings. Plaintiff further argues that the defendants had no reason to believe he was involved in the accident fraud; since the attorneys involved referred the investigators and reporters to other doctors, he made no false diagnoses or issued any phony bills.

Plaintiff contends that the proper standard is whether the publication was false, and whether there was a lack of reasonable grounds for belief in the truth of the publication. He urges that the controlling question here is whether the defendants conducted a reasonable investigation. He maintains that the defendants made no efforts to talk to any person at Holy Name identified as working for him, that they waited until the last minute to inform him—by message—that a series would be published; they did not attempt to reach him at home or by another phone and that the reporters did nothing to investigate his relationship with the attorneys or other doctors at the clinic.

Summary judgment will be granted if the pleadings, depositions, admissions, exhibits and affidavits on file reveal that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. (See *Carruthers v. B.C. Christopher & Co.* (1974), 57 Ill. 2d 376, 313 N.E.2d 457.) In making this determination, the trial court must review the material in the light most strictly against the moving party and most favorable to the nonmoving party. (*Baier v. State Farm Insurance Co.* (1975), 28 Ill. App. 3d 917, 920, 329 N.E.2d 543.) Summary judgment provides a means of disposing of cases with dispatch, but since it is a drastic method, it should be invoked with caution and allowed only when the right of the party seeking to invoke the summary judgment is free from doubt. See *Great-West Life Assurance Co. v. General Accident Fire & Life Assurance Corp.* (1983), 116 Ill. App. 3d 921, 452 N.E.2d 550.

Summary judgment must not be used to preempt the right to a trial by jury or the right to fully present the factual basis where a material dispute may exist. (See *Roberts v. Dahl* (1972), 6 Ill. App. 3d 395, 405, 286 N.E.2d 51.) In reviewing the trial court's grant or denial of summary judgment, where appropriate, this court will con-

sider all grounds urged and facts present in the trial court to determine if a genuine issue as to a material fact remains to be decided by a jury and whether or not defendants are entitled to summary judgment as a matter of law. See *Kamberos v. Schuster* (1971), 132 Ill. App. 2d 392, 398, 270 N.E.2d 182.

██ Applying these principles of law to the instant facts, we conclude that the trial court's denial of the summary judgment motion was proper on the grounds that genuine issues of material fact exist as to whether the publications were false, and whether the defendants either knew them to be false, or believing them to be true, lacked reasonable grounds to believe the truth of the publications. As plaintiff points out, failure to make reasonable investigation into the truth of the statements is one consideration regarding whether or not the defendants had reasonable grounds to believe that the statements were true. We acknowledge that the reporters' affidavits provide a recitation of what occurred during the investigation, state the procedures utilized for record keeping purposes during the investigation, and attest that either the statements were true, or that as a result of the investigations, the reporters had a reasonable basis to believe the truth of the publication. However, we have carefully reviewed the pleadings, the memoranda in support and in response to the summary judgment motion, the defendants' affidavits and the relevant portions of the deposition transcripts. We believe that notwithstanding the plaintiff's failure to file counteraffidavits, in light of the extensive investigation, the reporters' own participation in the investigation where they posed as accident victims and their ability to observe firsthand the purportedly illegal activities that were transpiring, including unnecessary medical treatments, phony work excuses, and the interrelationship between the medical personnel, the attorneys and the "ambulance chasers," the reporters had independent and firsthand knowledge of the underlying facts. They were in the best position to report the results of the investigation with resounding accuracy. Furthermore, we believe that several inferences may be drawn from the underlying facts, and if fair-minded persons could draw different inferences from these facts, then a triable issue exists which precludes the entry of summary judgment. See *Practical Offset, Inc. v. Davis* (1980), 83 Ill. App. 3d 566, 404 N.E.2d 516.

██ Although it is well settled in Illinois that one of the consequences of failing to file a counteraffidavit is that all of the alleged statements made in the affidavit stand as admitted (see *Komater v. Kenton Court Associates* (1986), 151 Ill. App. 3d 632, 502 N.E.2d 1295), and may very well warrant the grant of summary judgment, it

is also well settled that summary judgment is improper where the trial judge is required to decide controverted issues of fact or draw fact inferences. (See *State Farm Mutual Automobile Insurance Co. v. Short* (1970), 125 Ill. App. 2d 97, 260 N.E.2d 415.) Accordingly, we further find that based on the circumstances of this case, wherein certain fact inferences remain to be resolved by the trier of fact, summary judgment is improper.

 Moreover, the record reflects that during his deposition, plaintiff stated that he did not recall whether he saw the reporters on December 4. He stated that he only saw patients of other doctors on some occasions, in an effort to assist in the screening process, *i.e.*, that the chart(s) "appeared to be in good order as far as the vital statistics." Vital statistics consist of address, social security number and the like. He further stated that he recalled seeing a woman, not his patient, and "that she might have worked at a medical center." After determining that the woman had not hurt anything that he could have been of help for, he instructed her to sit outside (in the examination waiting area). Plaintiff further stated that the woman "came back into the room and asked him about bunions." He then told her, "Here's my card. You can give me a call. You can make an appointment. *** That's how we examine bunions." He recalls either pointing to her shoe or passing his hand along the side of it. However, he never conducted an examination on the woman. At the very least, a genuine issue of material fact exists as to whether or not the plaintiff conducted an examination on this reporter.

For all of the above reasons, we answer the first question certified to this court in the negative and the second question affirmatively. The trial court's denial of defendants' motion for summary judgment is affirmed, the stay order as to the proceedings below is hereby lifted, and the matter is remanded to the trial court for further proceedings.

Affirmed and remanded.

CAMPBELL and O'CONNOR, JJ., concur.

SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

JUSTICE MANNING delivered the opinion of the court:

Defendants have filed a petition for rehearing asserting that because of the *Mittelman* case (*Mittelman v. Witous* (1989), 135 Ill. 2d 220, 552 N.E.2d 973), which was not discussed in our opinion, this

court has incorrectly determined the requisite mental state plaintiff must allege and prove in the underlying defamation action. In addition, defendants seek a point of clarification in reference to part of the order of this court regarding the February 15 publication.

Having read the petition alone, and in conjunction with *Mittelman*, the United States Supreme Court decision in *Milkovich v. Lorain Journal Co.* (1990), 497 U.S. ___, 111 L. Ed. 2d 1, 110 S. Ct. 2695, and those cases cited to in our opinion, we remain steadfast in the views previously expressed in our opinion. Although we find the facts in *Mittelman* to be distinguishable from those in the case at bar, for clarity's sake, we will briefly discuss the assertions raised by defendants and our rationale for the conclusion that *Mittelman* does not change the result here.

■■■ Initially, *Mittelman* addresses the instance wherein the trial court is called upon to determine whether an utterance is one of fact or opinion, which requires application of the *Ollman* test. In *Ollman v. Evans* (D.C. Cir. 1984), 750 F.2d 970, the Federal Court of Appeals enunciated the factors necessary to the determination of whether an utterance is one of fact or opinion. Those four factors, to be viewed under the "totality of circumstances" are: (1) the specific language used; (2) whether the statement is verifiable; (3) the general context of the statement; and (4) the broader context in which the statement appeared. (*Ollman*, 750 F.2d at 979.) *Mittelman* then states where the trial court finds the utterance to be a statement of fact versus a constitutionally protected opinion, its further inquiry pertains "to any claim of defamation" as to whether such statement is: (1) false; (2) not subject to privilege; (3) made with the requisite mental state; and (4) incapable of a reasonable nondefamatory construction. (*Mittelman*, 135 Ill. 2d at 234.) As we have already discussed the application of the *Ollman* factors in the opinion, we need not readdress them; rather, we turn our attention to defendants' contention that the statements at issue are subject to Illinois common law privilege and that plaintiff must prove actual malice to overcome the privilege.

■■■ First, in response to defendants' claims that the privilege of "fair comment" is rejuvenated by *Mittelman*, we reiterate that it is our belief that such privilege has been supplanted by Federal constitutional law. In fact, *Mittelman* concedes that "this court [the Illinois Supreme Court] found that the *New York Times* holding had essentially replaced the 'fair comment' common law privilege." (*Mittelman*, 135 Ill. 2d at 235, quoting *Colson v. Stieg* (1982), 89 Ill. 2d 205, 209, 433 N.E.2d 246.) Although such holding is often cited to as a sword, *i.e.*, the right of the public to be informed and of the media to engage

in "robust discussion" about matters of public concern, it is our view that commencing with *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997, it is to be used as a shield in factual situations precisely like the one before us. In the first situation, such statement when used in context refers to public officials, public figures and public persons. However, in our opinion and this supplemental opinion, we principally rely upon such statement as a clarification of the *Gertz* Court's rejection of the *Rosenbloom* holding (which applied the actual malice standard to matters involving public concern) and its rationale for declining to impose such stringent requirements when the distinction to be considered involves the rights of a private individual plaintiff who has suffered wrongful injury to reputation versus those rights of free press and free speech of a media defendant. And herein lies the major similarity between the factual matrix in the instant matter and those present in *Gertz* and *Milkovich* on the one hand; and on the other hand, the major distinction between the facts here presented and those in *Mittelman* and *Colson*. *Gertz*, as discussed in our opinion, which involved libel litigation between a private plaintiff, an attorney, and a media defendant, placed significant emphasis upon the balance that must be accorded between the law of defamation and freedoms of speech and press. The Court concluded that neither our Constitution nor State common law principles require imposition of the public interest or public concern element, that serves as the basis of "fair comment"[5] when a private person is involved. The major reason for this rule is based upon sound theory when juxtaposed with the then radical rule in *New York Times*, that is, the private plaintiff has not voluntarily chosen to be placed in a public light and is not afforded the same channels of rebuttal as a public person under circumstances where the purported defamation is published in the media.

 Similarly, in *Milkovich*, which involved a private plaintiff and a media defendant, the Supreme Court stated "where a statement of 'opinion' on a matter of public concern reasonably implies false and defamatory facts regarding public figures or officials, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard of their truth";

---

[5]Prior to *Gertz*, both the State and Federal courts in Illinois had defined the common law privilege of fair comment and determined that certain statements would be subject to the privilege if they were: (1) comments, (2) based upon stated facts, and (3) about a matter of public concern. These factors were clearly set forth in *Hahnemannian Life Insurance Co. v. Beebe* (1868), 48 Ill. 87, and *Brewer v. Hearst Publishing Co.* (7th Cir. 1950), 185 F.2d 846.

however, "where such a statement involves a private figure on a matter of public concern, a plaintiff must show that the false connotations were made *with some level of fault as required by Gertz.*" (Emphasis added.) (*Milkovich*, 497 U.S. at ___, 111 L. Ed. 2d at 19, 110 S. Ct. at 2706-07.) Accordingly, it is clear to us that the policy reasons underlying the United States Supreme Court's decisions in *Gertz* and *Milkovich* pronounce strong considerations for a substantial number of high State courts to reconcile the competing interests of no intrusion into the area of free expression and the State's duty to protect a private person's reputation from false and defamatory statements that are publicized in a widespread media, and conclude that negligence is the requisite mental state to be proved.

We recognize that the privilege of "fair comment" was mentioned in *Colson* and *Mittelman* in context with other common law privileges which involve public issues and concerns; however, even if our supreme court were to hold that such privilege survives *Gertz* as a common law privilege in most situations, such was not the pronouncement in those cases. To the contrary, fair comment was not in issue in either case; rather, at issue was the common law privilege of common interest as between the parties or the small group involved. Contrary to defendants' assertions, we believe the question here and in *Gertz* concerns the public interest as would affect an entire society or large part thereof. The difference is that the speech at issue in the common interest situation involves speech that is in the individual interest of the speaker and its specific audience. In the *Gertz* situation, the speech conceivably is about a public issue that is intended for and either has the potential to or does reach a large segment of the general populace outside a specific interested audience. The harm inflicted and to be corrected in the latter situation where a private person is affected might well be irreversible, as the *Gertz* Court enunciated. Our decision is not meant to change the face of the law of defamation or privilege, as we agree that where a common law privilege is applicable, the rule is that actual malice must be proven to overcome the privilege. However, our point of divergence is based upon the narrow fact pattern here presented, where the trial court was called upon to reconsider that the common law rules of privilege, *i.e.*, speech made in the common interest and intended for a specific audience (at issue in *Mittelman* and *Colson*), are "not the same as those related to constitutional privilege" (*Mittelman*, 135 Ill. 2d at 237), *i.e.*, the supplanting of "fair comment" by *New York Times* and *Gertz*. We reiterate that the trial court was correct in its determination and find that the *Mittelman* holding neither detracts from nor changes our affirmation of that decision.

We decline to accept the defendants' assertion that the mere mention of "fair comment" in *Mittelman* unequivocally expresses the view by our high court that actual malice is the requisite mental state to be applied in each instance when a public issue or concern is involved. It is our view that our high court has neither squarely addressed nor reconciled the *Gertz* holding, which found no place in defamation law for the issue of public concern as a cloak of protection for the media defendant, when a private person's injury to reputation is involved.

■ Contrary to defendants' assertions here, our high court has not concluded that malice is the standard to be applied in a defamation action involving a private plaintiff and a media defendant, notwithstanding the potential presence of a public issue. Nor has the court discussed the continued need for the common law privilege of fair comment, outside the realm of a constitutionally protected opinion, in light of the *Gertz* holding. Rather, the law in Illinois as it stands today states that proof of negligence is sufficient where a private plaintiff is involved and no common law privilege is applicable. (*Troman v. Wood* (1975), 62 Ill. 2d 184, 340 N.E.2d 292.) Because we have critically addressed the narrow issue presented in light of the current law in Illinois, in reliance on the law set forth by the United States Supreme Court and the law in over three-fourths of our sister States, we adhere to the conclusion set forth in our opinion.

■ Finally, we clarify our order on remand to the trial court that concerns the February 15 publication. We restate that the publication *standing alone* could be capable of a nondefamatory construction; however, it was republished along with another article and photograph concerning the plaintiff in a special reprint that also concerned several other persons purportedly involved in accident fraud and swindling. When viewed in that larger context, the February 15 publication is not reasonably capable of a nondefamatory interpretation. To the contrary, the publication in the context in which it appeared in the later special reprint implies that plaintiff is guilty of wrongdoing, and such implication is reinforced and strengthened where plaintiff was identified in relationship to a group of individuals who were accused of fraudulent activities. Whether the publications were in fact understood to so harm the plaintiff in his profession are fact determinations to be made by the jury.

For the foregoing reasons, we adhere to the judgment previously entered by this court in the instant matter.

Affirmed and remanded.

CAMPBELL and O'CONNOR, JJ., concur.