35 F.3d 568
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Rudy SANGSTON, Plaintiff-Appellant,
v.
RIDGE COUNTRY CLUB, John R. Kelly, Richard T. Ryan, et al.,
Defendants-Appellees.
 No. 93-3454.
 United States Court of Appeals, Seventh Circuit.
 Argued April 21, 1994.
Decided Sept. 6, 1994.
 
 Before CUMMINGS, MANION and ROVNER, Circuit Judges.
 
 ORDER
 
 1
 Ridge Country Club terminated Rudy Sangston from his position as general manager. He sued, asserting one breach of contract claim, one tortious interference with contract claim, and eight libel claims. The district court dismissed his suit, concluding that his pleading did not state a claim. He has appealed and we affirm.
 
 I. Facts
 
 2
 This case was resolved on a motion to dismiss. Therefore, we set forth the facts as they were presented in the complaint in the light most favorable to the plaintiff.
 
 
 3
 In the spring of 1991, Ridge Country Club was looking for a new club manager. Ridge's acting general manager interviewed Rudy Sangston for the position. At the time, Sangston was the manager of a country club in St. Louis, Missouri. The acting general manager recommended Sangston to the Ridge board of directors for the position. The Ridge board met on April 23, and authorized the club's president to negotiate a contract; the official minutes from the April 23 board meeting note the following: "The search committee recommends Rudy Sangston. He wants a 2-year contract at a salary of $72,000 and was originally offered $65,000. A motion to authorize the president to negotiate a 2-year contract for up to $72,000 in annual salary was approved."
 
 
 4
 On April 24, Sangston and Ridge entered an oral agreement consistent with the authorized terms: Ridge hired Sangston as club manager for a period of two years at a base salary of $72,000 per year, plus benefits. In June, Ridge promoted Sangston to general manager; although this changed Sangston's job description, it had no effect on his salary and benefits. Apparently, all went well between Sangston and Ridge until the following October. On October 3, club member Thomas Burns penned a letter implying that Sangston had mismanaged the club. Specifically, he charged that Sangston had forced one employee to resign, fired another, caused another to quit under duress, and had dramatically increased prices in the dining room. Burns sent this letter to at least forty club members, including the club's officers and directors.
 
 
 5
 Ridge held a special meeting on October 29 to address Sangston's performance. Burns showed up and expressed dissatisfaction with Sangston. At least two other club members, Richard T. Ryan and John R. Kelly, also voiced concerns at the meeting. Ryan accused Sangston of using the club's telephones to make unauthorized calls. Kelly made the same accusation. Ridge relieved Sangston of his duties in November, and officially terminated his employment on December 6, 1991.
 
 
 6
 Sangston then applied for unemployment benefits with the Illinois Department of Employment Security. Ridge opposed the application; the country club notified its agent, Automatic Data Processing, that Sangston was discharged for making unauthorized "900" telephone calls. Automatic Data Processing used this information to oppose Sangston's application on Ridge's behalf. It filed a formal opposition to Sangston's unemployment benefits request, alleging that "Claimant was discharged for unauthorized use of the telephone, claimant was making calls (900) numbers, claimant was discharged for misconduct...." Sangston does not make clear whether the Illinois Department of Employment Security denied his claim for unemployment benefits.
 
 
 7
 Sangston filed a ten-count complaint in federal district court against Ridge, Burns, Ryan, and Kelly. In count I, he alleged that Ridge had breached the employment contract by terminating him before two years had run. In counts II and III, he alleged that Ridge libeled him by telling Automatic Data Processing about "900" telephone calls. In counts IV, V, VII, VIII, IX, and X he alleged that Burns, Ryan and Kelly libeled and defamed him: Burns by writing and sending the October 3 letter; and all of them by making negative comments about him in the October 29 meeting. In count VI, he alleged that Burns tortiously interfered with his employment contract by writing the October 3 letter.
 
 
 8
 The district court dismissed the complaint. As to count I--the breach of contract claim--the court concluded that Sangston had failed to attach sufficient documentation of a contractual relation to satisfy the Illinois Statute of Frauds. The district court dismissed count I without prejudice, encouraging Sangston to amend the complaint by attaching any writings. The court dismissed the nine other counts with prejudice. Sangston then filed a separate suit, attempting to correct the pleading defects in the breach of contract claim. The court read that simply as an amended complaint, and after reviewing the merits, dismissed it with prejudice. The court concluded that the documentation Sangston finally attached was insufficient. Sangston has appealed; we have been asked to review the propriety of the district court's dismissal on all counts.
 
 II. Analysis
 
 9
 We review the district court's dismissal for failure to state a claim de novo. Midwest Grinding Co., Inc. v. Spitz, 976 F.2d 1016, 1019 (7th Cir.1992). In conducting our review, we accept all material allegations made in the complaint as true, and we draw all reasonable inferences from the allegations in the plaintiff's favor. Scott v. O'Grady, 975 F.2d 366, 368 (7th Cir.1992). We will affirm the court's dismissal if "it appears beyond doubt that [the plaintiff] can prove no set of facts in support of this claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). "We will resolve the issues of state law which this case presents in accordance with the decisions of the Illinois Supreme Court. Where areas of state law are not developed, we will resort to other persuasive authority in an attempt to determine what the Illinois Supreme Court would decide." Todd v. Societe Bic, S.A., 21 F.3d 1402, 1405 (7th Cir.1994).
 
 
 10
 Essentially, this case concerns an employment relationship gone sour--something that commonly happens in any business. After an extensive search, Ridge chose Rudy Sangston as its new manager (and later, general manager) and agreed to pay him $72,000 per year over two years. But seven months later, faced with sporadic complaints, Ridge fired Sangston. Sangston filed suit. He claimed that his agreement with the country club did not permit his firing, and that the sporadic grumblings of certain members, as well as statements by the club about the reasons for his firing, amounted to libel under Illinois law. He also alleged that at least one instance of grumbling, Burns' October 3 letter, amounted to tortious interference with his employment agreement. We shall consider each issue in turn.
 
 A. Breach of Contract
 
 11
 Sangston's breach of contract claim fails at its inception because there was no written contract. To the extent there was an oral agreement, Sangston presents no writing to indicate that it was guaranteed for two years, as he now contends. A guaranteed contract means the employee gets paid full salary for a term, even if terminated. Needless to say, such contracts are rare. Professional athletes and corporate executives negotiate "no cut" contracts, but one can rest assured that they are written in careful detail. Sangston never asserts that guaranteed contracts are common in the field of country club management, much less oral guarantees.
 
 
 12
 Without a writing evidencing his alleged guaranteed agreement, Sangston runs headlong into the Illinois statute of frauds:
 
 
 13
 No action shall be brought ... upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized.
 
 
 14
 740 I.L.C.S. 80/1. Sangston admits that the oral agreement he is suing under could not have been performed in one year; he says he was given a two-year guaranteed contract. Under Illinois law, therefore, he cannot prevail on his action for breach of contract unless he produces at least a memorandum or note evidencing the type of agreement he entered: a guaranteed two-year deal.
 
 
 15
 In his initial complaint, Sangston did not attach writings to show the terms of his deal with Ridge. The district court dismissed the breach of contract claim without prejudice, encouraging Sangston to amend his pleadings to attach the vital documentation. In his next pleading, which he called his Second Amended Complaint, he made the same breach of contract claim, but this time he included some documentation. He attached a copy of Ridge's April 23 Board of Directors' Meeting Minutes, which authorized the club's president to "negotiate a 2-year contract for up to $72,000 in annual salary...." He also attached a series of letters from sympathetic club members, written after his termination to help him in his lawsuit, which indicated he had a two-year deal for $72,000 per year. Finally, he attached an evaluation form from his interview, which also mentions a two-year $72,000 salary. None of the documents--the minutes, the later compiled letters, or the evaluation form--indicates that the two-year contract was guaranteed. The district court dismissed Sangston's second pleading with prejudice, concluding that the documentation was insufficient to satisfy the Illinois statute of frauds.
 
 
 16
 Sangston's entire breach of contract claim rests on his allegation that he got the rarest kind of contract: a contract with a guaranteed salary and term. For a writing other than a formal contract to satisfy the Illinois statute of frauds, the writing must "establish a meeting of the minds as to basic details of the agreement...." Dresser v. Pyrrhus A.G., 936 F.2d 921, 928 (7th Cir.1991). See also Restatement Second Contracts Sec. 131(c) (the memorandum evidencing the agreement must state with "reasonable certainty the essential terms of the unperformed promises in the contract.").
 
 
 17
 In Illinois, employment relationships are presumed to be at will. A litigant who seeks to overcome the presumption of at-will employment and to establish a guaranteed deal must do so with "clear and definite language," Koch v. Illinois Power Co., 529 N.E.2d 281, 284 (Ill.App.1988)--with "language of a guarantee." Mann v. Ben Tire Distributors, Ltd., 411 N.E.2d 1235, 1237 (Ill.App.1980). Here, the documents Sangston relies on at best indicate only that he was given a two-year contract at $72,000 per year. He presents no documents which include any language of guarantee. We cannot presume that just because the writing identifies a duration, the oral agreement was guaranteed for that duration. In Mann, the employment contract was to cover "the period 1-1-75 through 12-31-75." 411 N.E.2d at 1236. The court refused to say that just because the contract identified a duration, it was guaranteed for that time. See id. at 1237 ("A time span for financial reckoning is not to be equated with duration of employment....").
 
 
 18
 We have previously held that similar language does not create a guarantee under Illinois law. In Buian v. J.L. Jacobs & Co., 428 F.2d 531, 532 (7th Cir.1970), we determined that an employment agreement stating "[i]t is scheduled that your assignment in Saudi Arabia will continue for a period of eighteen (18) months," did not guarantee a specific term of employment. Id. at 533. We concluded that the provision created merely an expectancy, and did not rise to a guarantee. Id.; see also Rubin v. Wolff Commodity Brokers, Inc., 636 F.Supp. 258, 259 (N.D.Ill.1986) (language in employment contract stating "[s]hould you still be in the company's employ 24 months after the commencement of your employment" was not a guarantee of two years' employment); Payne v. AHFI/Netherlands, B.V., 522 F.Supp. 18, 20 (N.D.Ill.1980) (language in employment contract stating that "[i]t is expected that the employee will remain in the foreign post for the duration of the project which is expected to be approximately two (2) years" did not guarantee a specific term of employment).
 
 
 19
 Like the plaintiffs in those cases, Sangston was only able to show the court that his employer identified a duration of employment in his contract. This does not mean that the contract was guaranteed for that duration. Ridge's two-year agreement established only an expectancy. The documents Sangston provides are not sufficient to overcome the presumption of at-will employment. In short, Sangston fails in his breach of contract claim because he does not identify a writing indicating that his job was guaranteed; there was no language of guarantee in the documents he produced to the court.
 
 
 20
 Because we have determined that the writings are insufficient to evidence a guaranteed contract, we need not resolve whether the writings are the type which may be substituted for a formal written contract under the Illinois statute of frauds. We note, however, the substantial problems in this respect: none of the writings were generated at the time and in contemplation of the oral agreement; the most important writing--the board minutes--does not describe a contractual meeting of the minds, but only an authorization to negotiate; the club members' letters were written long after the alleged oral agreement and the letters are not signed by persons authorized to contractually bind the country club. Any of these reasons might be an independent basis to conclude the writings were insufficient to satisfy the statute of frauds; that is how the district court resolved this matter. We need not engage in a detailed discussion of Illinois law on all of these points, however. Sangston fails under the statute of frauds in his breach of contract claim because he did not produce a writing sufficient to evidence a guaranteed employment contract.
 
 B. Libel
 
 21
 Sangston identifies three incidents where he claims to have been libeled: Burns' October 3 letter; the October 29 meeting where Burns, Kelly, and Ryan made negative comments about him; and Ridge's statement to Automatic Data Processing--which it passed along to the Illinois Department of Employment Security--that Sangston was making unauthorized 900 phone calls. The district court determined that Sangston's complaint did not state a claim for libel under Illinois law.
 
 
 22
 Sangston did not attach the October 3 letter to his complaint. He just summarized the letter. Nor did he identify the exact statements he found objectionable during the October 29 meeting, nor the context in which they were made. Again, he just summarized the statements of Burns, Kelly, and Ryan in a conclusory fashion. For Burns he alleged:
 
 
 23
 Upon information and belief, on or about October 29, 1991, at a special meeting of Defendant Ridge Country Club, and/or on other occasions, the dates of which are not presently known, Defendant Thomas Burns made oral accusations and allegations against Plaintiff. The aforesaid oral statements concerning Plaintiff imputed an inability to perform or want of integrity in performing the duties of manager of Defendant Ridge Country Club and prejudiced Plaintiff in his profession or trade. The aforesaid oral statements were made to members and/or officers and/or directors of Defendant Ridge Country Club.
 
 
 24
 For Ryan and Kelly he alleged that at the October 29 meeting they "made oral accusations and allegations against Plaintiff, including but not limited to accusing Plaintiff of abusing the telephone lines of Defendant Ridge Country Club for illegal and immoral purposes." He claimed these statements "imputed the commission of a criminal offense by Plaintiff, imputed an inability to perform of want of integrity in the discharge of Plaintiff's duties in his employment, and prejudiced Plaintiff in his profession and trade."
 
 
 25
 Illinois has abolished all distinctions between slander and libel and now applies the same rules to each. Mitchell v. Peoria Journal-Star, Inc., 221 N.E.2d 516, 518-19 (Ill.App.1966). Under Illinois law there are two categories of libel: libel per se, where the statements are so obviously defamatory that special damages need not be alleged or proved; and libel per quod, where special damages must be alleged and proved. Rosner v. Field Enterprises, Inc., 564 N.E.2d 131, 143 (Ill.App.1990).
 
 
 26
 1. Libel per se.
 
 
 27
 Illinois recognizes four categories of speech which are so defamatory in nature they are considered libel per se: (1) words imputing the commission of a criminal offense; (2) words imputing infection with a communicable disease of any kind which, if true, would tend to exclude one from society; (3) words imputing inability to perform or want of integrity in the discharge of the duties of office or employment; and (4) words prejudicing a party in his profession or trade. Rosner, 564 N.E.2d at 143. The second category immediately falls out of this case because nobody accused Sangston of having a communicable disease. We must determine whether Sangston has sufficiently stated a claim of libel per se for the remaining three categories.
 
 
 28
 It is difficult to assess the nature and impact of the statements the defendants allegedly made during the October 29 meeting. Sangston provided only conclusory summaries of the statements, which not so coincidentally track the elements of libel per se. We are told that Burns made statements indicating Sangston's "inability to perform or want of integrity in performing the duties of manager," and that Ryan and Kelly "accused Sangston of abusing the telephone lines ... for illegal and immoral purposes." The allegations about "inability to perform of want of integrity in performing" are classically conclusory. See Briscoe v. LaHue, 663 F.2d 713, 723 (7th Cir.1981) ("Conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss."). The only tangible fact which can be distilled from the complaint's allegations about the October 29 meeting is that Ryan and Kelly made some kind of accusation about Sangston "abusing the telephone lines." Taking this fact in a light most favorable to Sangston, we assume that Ryan and Kelly both stood at the meeting and said something like "Sangston is abusing the telephone lines." Assuming, as Sangston alleges, that this was a false statement, can it be considered libel per se?
 
 
 29
 Libel per se is a unique category of defamation. As we have said, it is limited to certain types of statements which are so harmful that damages will be presumed. Rosner, 564 N.E.2d at 143. A court considering an allegedly libelous statement must apply the rule of innocent construction, which simply means that "a written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff, it cannot be actionable per se." Chapski v. Copley Press, 442 N.E.2d 195, 199 (Ill.1982).
 
 
 30
 Must we assume that the statement "Sangston is abusing the telephone lines" imputed a criminal offense, or imputed an inability to perform as club manager, or prejudiced Sangston in his profession? Or is there any way to innocently construe these words? Nothing in this statement imputes a criminal offense; abusing the telephone lines is not indictable or punishable by incarceration, unless of course the abuse happens to be wire fraud or some other crime. See American Pet Motels, Inc. v. Veterinary Medical Ass'n, 435 N.E.2d 1297, 1300 (Ill.App.1982) (in order for a statement to be libel per se, "the offense charged must be indictable, involve moral turpitude, and be punishable by imprisonment."). There is no mention of wire fraud or some other crime anywhere in this record. Nor do the statements necessarily touch on Sangston's ability to perform as club manager or prejudice him in his profession. The words can be innocently construed to mean that Ryan and Kelly just objected to the way Sangston used the phone in conducting his duties. This does not mean they lied about his professional skills; they just question his use of the phone. The same is true about Burns' October 3 letter. It is at most an innocuous criticism about Sangston's performance; it may be innocently construed as just that. Certainly, the October 3 letter does not impute the commission of a criminal offense, nor does it necessarily impute a lack of integrity or lack of professional skill. Because the words are subject to innocent construction, they are not libel per se.
 
 
 31
 Sangston's true objection to accusations about phone use comes to light in his libel claim against Ridge--the claim which concerns Ridge's statements to Automatic Data Processing about Sangston's 900 telephone calls. Apparently, because 900 numbers are sometimes used for illicit reasons Sangston believes that this statement imputed immorality and illegality. But 900 numbers are also used for commercial and other reasons which are not illicit and illegal, such as telephone polls. The rule of innocent construction requires that we assume Ridge's statements concerned innocent 900 calls. Because this statement is subject to an innocent construction it therefore cannot be libel per se.
 
 
 32
 2. Libel per quod.
 
 
 33
 Ultimately, none of the alleged defamatory statements are "so obviously and naturally hurtful to [Sangston] that proof of their injurious character can be, and is, dispensed with." Reed v. Albanese, 223 N.E.2d 419, 422 (Ill.App.1966). All the statements are innocuous, or at least subject to innocent construction. To infer anything truly offensive in the statements, one must attach unlikely innuendo to their plain meaning. For instance, one must assume that the statements about the telephone calls implied use of illicit 900 numbers. Or one must assume that Burns' letter or other commentary about Sangston's job performance suggested illegality or immorality. Such libel--where extrinsic facts are necessary to infer the libelous meaning--is known as libel per quod. See Kolegas v. Heftel Broadcasting Corp., 607 N.E.2d 201, 206 (Ill.1992) ("Statements are considered defamatory per quod if the defamatory character of the statement is not apparent on its face, and extrinsic facts are required to explain its defamatory meaning.").
 
 
 34
 But a plaintiff is not entitled to rely on self-serving characterization to allege libel per quod. Harris Trust and Savings Bank v. Phillips, 506 N.E.2d 1370, 1376 (Ill.App.1987) ("In place of well pleaded 'extrinsic facts,' the second amended complaint is a litany of self-serving characterization and construction of the words spoken of and concerning the bank.... The trial court, therefore, correctly ruled that the banks had not sufficiently pleaded extrinsic facts to support an action for slander per quod."). Sangston does not specifically identify any libelous statements. He recounts circumstances where his performance was criticized, and asks us to conclude that the criticism was libelous. But the criticism, even in the conclusory fashion in which he describes it, falls short of libel. To infer anything remotely libelous, we would have to stack self-serving characterization upon self-serving characterization. It only makes sense, however, that a plaintiff who fails to repeat the actual libelous statements in his complaint should not survive a motion to dismiss simply by providing self-serving characterizations of the statements. Sangston fails to make a claim for libel per quod out of the sporadic grumblings of Ridge's members.
 
 
 35
 Also, a plaintiff asserting libel per quod is not entitled to the same presumption of harm as one asserting libel per se; a plaintiff making a libel per quod claim must specifically plead and ultimately prove special damages. Fed.R.Civ.P. 9(g); Brown and Williamson Tobacco Corp. v. Jacobson, 713 F.2d 262, 270 (7th Cir.1983). Even if we were permitted to infer that the statements could possibly be actionable as libel per quod, Sangston fails in his duty to plead special damages with specificity. In his complaint, he did not plead "actual, realized pecuniary injury." Brown, 713 F.2d at 270. He only makes general allegations that he was damaged by the statements. Even his most specific allegation--pertaining to Ridge's communication to Automatic Data Processing about 900 calls--does not specify any damage. He does not allege that he was denied unemployment insurance, and if so, how much.
 
 
 36
 Nor does Sangston show that he should be allowed at this point to amend his pleading to aver special damages. For us to require this entire process to restart in the district court, we would need at least some inkling that Sangston somehow suffered pecuniary damage because of the statements. He makes no attempt to show such pecuniary loss in his briefs to this court. Nothing in this case suggests that "justice requires" allowing Sangston to amend his complaint at this point. Fed.R.Civ.P. 15(a). See Jones v. Psimos, 882 F.2d 1277, 1285 (7th Cir.1989).
 
 C. Tortious Interference With Contract
 
 37
 Sangston's tortious interference claim rests on the premise that a country club member who lobbies to fire an incumbent manager employed at will is liable in tort for his actions. At the outset, we should note that if we recognize a claim for tortious interference in these circumstances, we would subject many common business activities to civil liability.
 
 
 38
 The district court resolved this question by saying that Burns could not have tortiously interfered with Sangston's contract, because as a club member and shareholder in Ridge, Burns had the legal right to complain about the way the contract was being performed. See Deanville Corp. v. Federated Dept. Stores, Inc., 756 F.2d 1183, 1196 (5th Cir.1985). While our own analysis varies somewhat, we agree with the district court's conclusion.
 
 
 39
 On occasion it is in a company's interest to breach a contract. Those in charge of the company make the decision to suffer any civil liability caused by the breach, in order to advance some more important interest. In doing so, they may technically meet some of the elements of tortious interference: (1) the existence of a valid and enforceable contract; (2) defendant's knowledge of the existing contract; (3) defendant's intentional and unjustified inducement of the breach; (4) subsequent breach by a third person due to defendant's wrongful conduct; and (5) resulting damage to plaintiff. Prince v. Zazove, 959 F.2d 1395, 1397 (7th Cir.1992). But courts have consistently refused to subject the people who induced the breach to liability in tort in such circumstances. In Swager v. Couri, 395 N.E.2d 921, 927 (Ill.1979), the Illinois Supreme Court recognized the "difficult questions ... posed ... when a director, officer or shareholder of a corporation is alleged to have interfered with the corporation's contractual relations." The court held that the defendants, who as officers, directors and shareholders, had caused their company to dissolve a contract, were not liable in tort for their actions. The court determined that the defendants were permitted--even privileged--to exercise business judgment to dissolve the contract, without facing liability in tort. To overcome this conditional privilege a plaintiff would have to prove that the defendant was motivated by actual malice. Prince, 959 F.2d at 1400.
 
 
 40
 Here we cannot presume malice when a country club shareholder complains about the manager's performance. Instead, we must presume that the shareholder is just exercising his prerogative to have some say in the direction of the club. If Sangston alleged that Burns had some financial motive to cause the breach, and that he used impermissible means to encourage it, then we might be required to recognize the possibility of malice. But all we have here is a letter complaining about mismanagement; the letter does not even suggest Sangston's dismissal. In this context Burns' letter would be privileged. There are many instances of self-scrutiny a business inevitably undertakes--such as critical employee evaluation forms--which result in employee dismissals. In those cases, the officers, directors, shareholders or even managers of the company are not tortiously interfering with anything. They are just exercising their prerogative in the management of the company.
 
 III. Conclusion
 For the foregoing reasons we
 
 41
 AFFIRM.